UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 CR 691 |
| | ) | Hon. Amy J. St. Eve |
| ANTOIN REZKO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On June 4, 2008, after extensive pretrial proceedings, an over three month trial, and over two weeks of jury deliberations, a jury convicted Defendant Antoin Rezko on sixteen counts in the Superseding Indictment, and acquitted him on eight counts. They convicted him on twelve counts of mail or wire fraud (Counts 1, 2, 4-6, 7-8, and 11-15), two counts of aiding and abetting bribery (Counts 17 and 20), and two counts of money laundering (Counts 23 and 24). Defendant now seeks judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Defendant's motion is denied.

**BACKGROUND**

On October 5, 2006, a grand jury returned a Superseding Indictment (the "Indictment") against Defendant Rezko and co-schemer Stuart Levine.[1] (R. 96-1, Superseding Indictment.)

---

[1] Stuart Levine pled guilty on October 27, 2006. (R. 120-1.) Levine entered into a written plea agreement with the government in which he agreed to cooperate with the government.

The Indictment charged that Defendant Rezko committed the following offenses: 1) mail or wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, including the deprivation of the intangible right to honest services, in violation of 18 U.S.C. § 1346; 2) attempted extortion, in violation of 18 U.S.C. § 1951; 3) aiding and abetting Stuart Levine's bribery concerning a federally funded program, in violation of 18 U.S.C. § 666; and 4) money laundering, in violation of 18 U.S.C. § 1956.

After extensive discovery and motion practice, Defendant proceeded to trial. Jury selection commenced on March 3, 2008. During the course of the trial, over 30 witnesses testified, and the Court admitted over 200 exhibits into evidence. The government also introduced extensive recordings from Title III wire taps on Stuart Levine's telephones. The government intercepted the telephone calls during the course of the charged scheme.

The jury began its deliberations on May 15, 2008. (R. 548-1.) On June 4, 2008, the jury returned its verdict against Defendant Rezko. (R. 565-1.) Specifically, the jury found Defendant guilty of mail fraud, as charged in Counts 1, 2, 7, 8, 11, and 12; wire fraud, as charged in Counts 4, 5, 6, 13, 14, and 15; aiding and abetting bribery, as charged in Counts 17 and 20; and money laundering, as charged in Counts 23 and 24. (*Id.*)

The thrust of the conviction was Defendant's scheme to defraud the people of the State of Illinois that he carried out with Stuart Levine and others. Specifically, Defendant Rezko was convicted of using his influence with Governor Blagojevich's administration and Stuart Levine's membership on two State of Illinois boards to influence the actions of these boards for private gain. Co-schemer Levine was a member of 1) the Board of Trustees of the Teacher's Retirement System of the State of Illinois ("TRS"), a public pension plan that provided benefits for teachers

employed by the Illinois public schools, and 2) the Illinois Health Facilities Planning Board ("Planning Board"), an Illinois Sate board that reviewed applications submitted by hospitals that wanted to build new facilities in Illinois. The jury convicted Rezko of defrauding the beneficiaries of TRS and the people of the State of Illinois of the honest services of Stuart Levine as a board member of TRS and the Planning Board. Rezko and Levine further used Rezko's influence with the Blagojevich administration and Levine's roles on the boards to influence the actions of TRS and the Planning Board for the benefit of themselves and others, and to carry out the scheme.

## ANALYSIS

### I.     Legal Standards

Defendant has moved under both Federal Rule of Criminal Procedure 29 for a judgment of acquittal, and Federal Rule of Criminal Procedure 33 for a new trial. Specifically, Defendant asserts that he is entitled to judgment of acquittal for the following: 1) the money laundering charges impermissibly merged with the mail fraud charges; 2) the government failed to introduce sufficient evidence to prove that the money laundering transactions were designed to conceal or disguise; 3) the government failed to prove Defendant's intent to defraud beyond a reasonable doubt; and 4) the government failed to prove the mailing charged in Count 11 beyond a reasonable doubt. Defendant Rezko further argues that he is entitled to a new trial because the Court should disregard Stuart Levine's testimony because it was so incredible, and without his testimony, the government cannot sustain its burden.

#### A.     Judgment of Acquittal

Defendant asserts that he is entitled to a judgment of acquittal pursuant to Federal Rule of

Criminal Procedure 29 ("Rule 29").  Under Rule 29, a court must enter a judgment of acquittal if, after considering all the evidence in the light most favorable to the Government, it concludes that "the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt."  *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005) (internal citation and quotation omitted).  Where the defendant challenges the sufficiency of the evidence presented at trial, the court must "consider the evidence in the light most favorable to the prosecution, drawing all reasonable inferences in the government's favor," and a "[r]eversal is appropriate only when, after viewing the evidence in such a manner, no rational jury could have found the defendant to have committed the essential elements of the crime."  *United States v. Macari,* 453 F.3d 926, 936 (7th Cir. 2006) (internal quotation omitted).  *See United States v. Emerson*, 501 F.3d. 804, 811 (7th Cir. 2007) ("[w]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.")  The Court cannot "weigh the evidence or second-guess the jury's credibility determinations."  *United States v. Spells*, 537 F.3d 743, 747 (7th Cir. 2008) (citations and quotations omitted).

### B.  Rule 33 –  New Trial

Defendant also contends that he is entitled to a new trial.  Federal Rule of Criminal Procedure 33 ("Rule 33") provides for a new trial where, after considering the credibility of the witnesses, the court concludes that the jury's verdict is "so contrary to the weight of the evidence that a new trial is required in the interest of justice."  *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).  A court may also grant a new trial "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial."

*United States v. Eberhart,* 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *United States v.*

*Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds by Eberhart v. United*

*States*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005).

## II.    Merger and Sufficiency of the Evidence for Money Laundering (Counts 23 & 24)

Defendant Rezko argues that the Court should grant judgment of acquittal on Counts 23

and 24 given the holdings in two opinions issued by the Supreme Court while the jury was

deliberating — *United States v. Santos*, __ U.S. __, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008)

and *Regalado Cellular v. United States*, __ U.S. __, 128 S. Ct. 1994, 170 L. Ed. 2d 942 (2008).

Both Counts 23 and 24 are money laundering charges, in violation of 18 U.S.C. §

1956(a)(1)(B)(i).  Section 1956(A)(1)(B)(i) makes it a crime to engage in a financial transaction

"involv[ing] the proceeds of specified unlawful activity ... knowing that the transaction is

designed in whole or in part ... to conceal or disguise the nature, the location, the source, the

ownership, or the control of the proceeds of specified unlawful activity."  18 U.S.C. §

1956(a)(1)(B)(i).  In order to prove Defendant Rezko guilty of either of these counts, the jury

had to find the following:

First, that defendant knowingly conducted or attempted to conduct a financial
transaction;

Second, the property involved in the financial transaction in fact involved the net
proceeds of mail fraud as charged in Counts 1 and 2;

Third, the defendant knew that the property involved in the financial transaction
represented the net proceeds of some form of unlawful activity; and

Fourth, the defendant knew that the transaction was designed in whole or in part to
conceal or disguise the nature, the source, the ownership, or the control of the net
proceeds of mail fraud as charged in Counts 1 and 2.

*See United States v. Esterman*, 324 F.3d 565, 569 (7th Cir. 2003).

Both Counts 23 and 24 were premised on the checks Sheldon Pekin paid to Joseph Aramanda from Pekin's finder's fee based on TRS's investment with Glencoe Capital. Specifically, the evidence at trial established that Shelly Pekin and Stuart Levine met in approximately December 2002 to discuss TRS investing money with Glencoe Capital, a private equity firm in which Pekin was an investor. TRS was seeking firms with which to invest benefits for teachers. TRS's Board reviewed all investment proposals for TRS's funds submitted by private investment management companies. Pekin wanted Levine to introduce Glencoe Capital to TRS. Levine agreed to do so and to use his influence and board position with TRS to obtain money for Glencoe Capital from TRS — for a portion of Pekin's finder's fee from Glencoe Capital. Pekin and Levine both testified that they had additional discussions after that initial meeting wherein they discussed Glencoe Capital paying Pekin a finder's fee for the TRS investment, and Levine getting a percentage of that fee. During several subsequent discussions, Levine told Pekin that he would have to split his finder's fee with another individual at Levine's direction.

After meeting with Defendant Rezko in Defendant's office in early 2003, Levine testified that he changed the recipient of the finder's fee at Rezko's direction, although he did not learn the new recipient until after TRS had approved the investment. Levine testified the he was willing to forego his portion of the finder's fee and instead direct the fee as Rezko told him because he "wanted to further ingratiate [himself] with Mr. Rezko, and [he] had already determined that [he] wasn't going to take a part of the fee.... And [he] thought it good business sense." Levine thereafter contacted Mr. Bauman, the Executive Director of the TRS, and asked him to have a meeting with Glencoe Capital and to "make sure they got an investment."

Glencoe Capital got the investment.

The evidence showed that in August 2003, the TRS Investment Committee of the Board voted to allocate $50 million to Glencoe Capital to invest. The Board was not aware of Levine's or Rezko's financial interest in the transaction when it approved the transaction, even though Levine was a member of the TRS Board. Furthermore, Mr. Bauman did not disclose Levine's request to make it happen.

Based on the investment, Pekin expected to receive a finder's fee of $375,000 from Glencoe Capital. The evidence showed that Pekin received over $250,000 of his finder's fee from Glencoe Capital through several checks. (Gov. Ex. Glencoe Checks Group.) Specifically, Glencoe Capital issued him the following checks: 1) a check in the amount of $62,500, dated September 12, 2003; 2) A check in the amount of $125,000, dated January 9, 2004; 3) a check in the amount of $93,750, dated March 1, 2004; and 4) a check in the amount of $93,750, dated May 26, 2004. (*Id.*)

At Rezko's direction, Levine testified, and the taped telephone conversations corroborated, that he directed Pekin to pay a portion of his finder's fee to Joe Aramanda, an individual Pekin did not know. Pekin thereafter, at Levine and Rezko's direction, issued two $125,000 checks to Aramanda's company — J.R.A. Investments, LLC — out of the proceeds of the $375,000 from the fraudulent scheme. (Gov. Ex. Aramanda Check 1 & Aramanda Check 2.) At the time Pekin gave Aramanda the March 4, 2004 checks, he had already received over $250,000 from his finder's fee from Glencoe Capital. (Gov. Ex. Glencoe Checks Group.) Count 23 charged Defendant in connection with the March 4, 2004, $125,000 check to Aramanda, and Count 24 charged him with the April 26, 2004, $125,000 check to Aramanda.

**A.     *United States v. Santos***

Defendant Rezko argues that *Santos* requires an acquittal on Counts 23 and 24 because

the mail fraud and money laundering charges "merge" because both charges are based solely on

the distribution of the receipts ─ rather than the profits ─ of the underlying mail fraud scheme.

The evidence at trial, however, established that the checks at issue in Counts 23 and 24 were

profits of the honest services mail fraud scheme, not receipts, thus Defendant's argument fails.

In *Santos*, the Supreme Court addressed the meaning of "proceeds" under the money

laundering statute, 18 U.S.C. 1956(a)(1)(A)(i).  The defendant in *Santos* had been convicted of

one count of conspiracy to launder money (18 U.S.C. § 1956(a)(1)(A)(i) and 1956(h)) and two

counts of money laundering (1956(a)(1)(A)(i)).  His conviction was based on payments the

defendant made to winners and runners in his illegal lottery business.  The payments were made

using the receipts from the defendant's illegal lottery operation.  Although the convictions were

upheld on direct appeal, the Seventh Circuit had affirmed setting the convictions aside based on

a motion under 28 USC § 2255.  The Supreme Court affirmed the judgment of the Seventh

Circuit.

In a four justice plurality opinion authored by Justice Scalia, the plurality held that

"proceeds" in Section 1956(A)(1)(a)(i) means profits, not receipts, derived from specified

unlawful activity.  Justice Scalia noted that Section 1956 does not define proceeds, and that no

common meaning of proceeds exists.  Given the ambiguity in the meaning of proceeds, "[t]he

rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants

subjected to them"  *Id.* at 2025.  "Because the 'profits' definition of 'proceeds' is always more

defendant-friendly than the 'receipts' definition, the rule of lenity dictates that it should be

adopted." *Id.*

In reaching its holding, the plurality expressed its concern with "merger" under the money laundering statute. Merger occurs when the money laundering conviction "merges" with the underlying crime generating the proceeds such that a separate conviction on the underlying crime would be tantamount to a conviction on the money laundering offense. As the plurality noted:

> The merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds-for example, the felon who uses the stolen money to pay for the rented getaway car-would violate the money-laundering statute. And any wealth-acquiring crime with multiple participants would become money-laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering.

*Santos*, 128 S. Ct. at 2026 -27.

In order to address the "merger" concern, the plurality adopted "profits" as the definition of proceeds.[2] Justice Stevens, who concurred in the plurality opinion, did not accept this definition. Instead, Justice Stevens agreed "the revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the meaning of the money laundering statute," but noted that "proceeds" could mean gross receipts

---

[2] Because the Seventh Circuit adopted a "profits" definition of "proceeds" in this context prior to the Supreme Court's opinion in *Santos*, *see United States v. Malone*, 484 F.3d 916, 921 (7th Cir. 2007), the Court instructed the jury that the term "net proceeds" for purposes of Counts 23 and 24 is defined as the proceeds remaining after deducting the direct business costs, if any, incurred in acquiring the proceeds. (R. 543-1 at 62.) Thus, the Court instructed the jury consistent with *Santos*.

for other underlying specified unlawful activities.  *Id.* at 2032-33.  Given the divergent views of the plurality and the concurrence, courts have debated the impact of *Santos* beyond illegal gambling cases.  *See United States v. Poulsen*, No. CR2-06-129, 2008 WL 2944680 (S.D. Ohio Aug. 1, 2008); *United States v. Orosco*, __ F. Supp.2d __, No. 07-CR-00275, 2008 WL 4194878, at *3-4 (D. Colo. Jul. 17, 2008) (finding that, given Justice Stevens' concurrence, *Santos* does not impact the Tenth Circuit's interpretation of "proceeds" "when the underlying [specified unlawful activity] is some act other than illegal gambling").

The government established that the $125,000 checks from Pekin to Aramanda were profits from the scheme, not receipts, thus satisfying its burden under the plurality holding in *Santos*.[3]  Pekin received $375,000 as a "finder's fee" as part of the mail fraud scheme.  Pekin then, at Rezko's and Levine's direction, paid Aramanda $250,000 in two separate checks.  These checks did not constitute expenses of the underlying fraudulent activity.  *See United States v. Segal*, 495 F.3d 826, 838-39 (7th Cir. 2007) (money laundering established where net proceeds).  *See also United States v. Everett*, No. CR 06-795-PHX-JAT, 2008 WL 3843831 (D. Ariz. 2008) ("because the laundered "proceeds" were "profits" as opposed to expenses or "receipts," the *Santos* ruling, even if it were not a plurality decision, would not require a reversal of the money laundering convictions").  Instead, they were payments from the profits of the scheme.  As such, viewing the evidence in the light most favorable to the government, the government proved that each of the $125,000 payments constituted profits of the mail fraud scheme.

**B.     The Government Proved that the Purpose of the Transactions in Counts 23 and 24 Was to Conceal or Disguise**

---

[3] The Seventh Circuit has applied its *Santos* holding beyond illegal gambling cases.  *See United States v. Malone*, 484 F.3d 916, 921 (7th Cir. 2007).

Defendant argues that *Cuellar* requires a judgement of acquittal on Counts 23 and 24 because the government failed to prove that the purpose of the payment of each $125,000 check from Pekin to Aramanda was to conceal or disguise any attribute of the funds. The Court disagrees.

In *Cuellar*, the Supreme Court reversed a money laundering conviction under Section 1956(a)(2)(B)(I) where the defendant transported approximately $81,000 in cash in a hidden compartment in his vehicle from Texas toward Mexico because the government only introduced evidence that the defendant physically hid the money during its transportation ─ not that he intended to conceal the nature, location, source, ownership or control of the proceeds of specified unlawful activity. The Supreme Court held that the "designed ... to conceal" element of money laundering under Section 1956(a)(2)(B)(i) required proof that the transaction was "designed in whole or in part to conceal or guise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity." *Id.* at 2003-04. It found that a conviction under Section 1956(a)(2) required that "the purpose – not merely the effect – of the transportation was to conceal or disguise a listed attribute." *Id.* The Supreme Court reversed the defendant's conviction because "merely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money." *Id.* The Court noted that "*how* one moves the money is distinct from *why* one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." *Id.* at 2005. (emphasis in original.)

As an initial matter, *Cuellar* addressed the transportation prong of the money laundering statute, not the transaction prong as charged in Counts 23 and 24. The Court need not resolve,

11

however, whether *Cuellar* applies to Section 1956(a)(1) charges because the evidence at trial proved beyond a reasonable doubt that Defendant's movement of the profits from the Glencoe Capital transaction from Pekin to Aramanda was designed to conceal the nature, source, ownership or control of the $250,000. *See United States v. Huezo*, __ F.3d __, 2008 WL 4553150 (2d Cir. Oct. 14, 2008), at * 3 (holding that the *Cuellar* holding applies to the transaction prong of money laundering as well as the transportation prong).

The Seventh Circuit has articulated two broad principles for addressing concealment in the context of the money laundering statute. First, the "initial transaction from which illegal proceeds were derived" must maintain some separation from the "further transactions designed to conceal the source of those proceeds." *Esterman*, 324 F.3d at 570, citing *United States v. Scialabba,* 282 F.3d 475, 476-78 (7th Cir. 2002). Second, the subsequent transaction "must be specifically designed to hide the provenance of the funds involved" because "the mere transfer and spending of funds is not enough to sweep conduct within the money laundering statute." *Id.* (citing *United States v. Jackson,* 935 F. 2d 832, 843 (7th Cir. 1991)).

Viewing the evidence in the light most favorable to the government, Rezko and Levine arranged for Pekin to obtain $375,000 through a fraud scheme. The $375,000 finder's fee to Pekin constituted the net proceeds of the underlying mail fraud scheme described above. Namely, the fee was the profit from the scheme to deprive TRS of Levine's honest services in connection with TRS's investment in Glencoe Capital. This initial transaction is separate from the March 4, 2004 and April 26, 2004, $125,000 transactions between Pekin and Aramanda.

Furthermore, as the testimony of Steve Loren, Stuart Levine, and Sheldon Pekin established, the March 4, 2004 and April 26, 2004 transactions were designed to conceal the true

nature, source, ownership, or control of the proceeds of the underlying scheme to fraud. The

evidence — including Levine's testimony and the recorded calls — demonstrated Rezko's

control over the $250,000. Sheldon Pekin testified that within weeks before February 28, 2004,

Stuart Levine gave him the names of Joe Aramanda and his "company" JRA Investments LLC.

At that time, Mr. Pekin did not know Mr. Aramanda and was not familiar with JRA Investments.

Aramanda was the individual to whom Defendant Rezko wanted Pekin to give a percentage of

his finder's fee. Levine then gave Pekin the phone number for Mr. Aramanda, and Pekin called

him to set up a meeting. (Gov. Ex. Pekin File Folder.) During their meeting, Mr. Aramanda told

Mr. Pekin that he and Mr. Rezko were good friends. Mr. Pekin discussed paying $250,000 of

the finder's fee to Mr. Aramanda — half of it during the first week of March 2004 and half the

first week of July. Stuart Levine subsequently brought Mr. Pekin a draft sham contract to sign

with Aramanda. (Gov. Ex. Draft Aramanda Contract.) Steve Loren prepared that draft contract

in approximately November of 2003 at Levine's direction to make the agreement between Pekin

and Aramanda "look legitimate." Loren, who was legal counsel to TRS, did not disclose to TRS

that Mr. Pekin would share his finder's fee with another person. Although Loren did not know

that Aramanda would be the recipient of a portion of the finder's fee, he understood that Tony

Rezko would dictate the recipient. Loren, who was concerned about the sham contract, had it

erased from his computer.

The evidence further showed that Mr. Pekin thereafter met with Aramanda on March 4,

2004. Mr. Pekin gave Aramanda a check in the amount of $125,000, made payable to JRA

Investments L.L.C., dated March 5, 2004. (Gov. Ex. Armanda Check 1.) At the meeting, Pekin

and Aramanda discussed the sham contract which provided that Pekin would pay Aramanda a

certain percentage of the "funds investors identified by J.R.A. Investments, LLC commit to and actually invest with Sheldon M. Pekin's clients," despite the fact that Mr. Armanda had not assisted Pekin or Glencoe Capital in any way to get TRS to invest with Glencoe Capital. (Gov. Ex. Final Armanda Contract at ¶ 5.) Indeed, TRS had already approved the investment with Glencoe Capital when Pekin and Aramanda executed this sham contract. The sham contract concealed that Aramanda received a portion of the finder's fee from Glencoe Capital for the TRS investment, and that Armanda received the $250,000 without doing any work for Pekin or Glencoe Capital. As the evidence established, Armanda received that money because Rezko arranged for him to receive it. Pekin never heard from Aramanda after Pekin gave him the money.

Rezko's control over the placement of the money was further proven through the April 26, 2004 transaction. Mr. Pekin testified that shortly before April 26, 2004, Mr. Aramanda called him and said that the was expecting the second $125,000 check from Pekin. In response, Mr. Pekin asked him "Did Christmas come early this year?" Mr. Pekin testified that he did not expect to make the second payment until the first week of July because he was supposed to receive the second installment of the Glencoe Capital finder's fee at that time. When Mr. Pekin refused to give the check to Mr. Aramanda at that time, Stuart Levine called Pekin and said he was angry that Mr. Pekin did not give Aramanda the check. In a recorded conversation, Levine told Pekin that he needed to get the check to Aramanda because "[i]f we don't get it done today, we won't be able to do business with them anymore." (Gov. Ex. Call 196, 4/17/2004, at 2.) Pekin understood "them" to be Defendant Rezko and Aramanda. Indeed, Levine told Pekin that "If we dont't get it finished today, Tony's gonna – not gonna – do business anymore like that."

(*Id.*)  In a subsequent recorded telephone conversation introduced at trial, Levine told Pekin "I don't think money was due, but Tony asked me to call."  (Gov. Ex. Call 43, 4/26/2004, at 1.)  After the conversation with Levine, Pekin contacted Aramanda and paid him the second $125,0000 on April 26, 2004.  (Gov. Aramanda Check 2.)  Pekin never saw Aramanda again, and neither Aramanda nor JRA Investments LLC did any work for Pekin or Glencoe Capital.  Contrary to Defendant's assertion, the evidence far exceeded a "mere transfer" of funds from Pekin to Aramanda.  The government has proven Counts 23 and 24 beyond a reasonable doubt.

III.    **The Government Proved Mail and Wire Fraud Beyond a Reasonable Doubt**

Defendant argues that the government failed to prove him guilty of mail fraud beyond a reasonable doubt.  In order to prove mail or wire fraud, the government must prove the following elements beyond a reasonable doubt:  1) a scheme to defraud; 2) an intent to defraud; and 3) use of the mails or wires in furtherance of the scheme to defraud.  *See United States v. Adcock*, 534 F.3d 635, 639 (7th Cir. 2008); *United States v. Roberts*, 534 F.3d 560, 569 (7th Cir. 2008); *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007); *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006).  In order to establish that the scheme or artifice to defraud involved the deprivation of the intangible right to honest services, the government must prove that the defendant misused his position for private gain.  *See United States v. Sorich*, 523 F.3d 702, 708-09 (7th Cir. 2008); *United States v. Thompson*, 484 F.3d 877, 883-84 (7th Cir. 2007); *see also United States v. Segal*, 495 F.3d 826, 834-35 (7th Cir. 2007).

## A. Evidence of Rezko's Knowledge and Intent to Defraud

Defendant Rezko argues that the government failed to prove his knowledge and intent to defraud beyond a reasonable doubt. The thrust of his argument is that the government relied solely on Levine's testimony and that Levine was not believable. The Court, however, cannot make credibility determinations or reweigh the evidence on a Rule 29 motion. *See United States v. Spells*, 537 F.3d 743, 747 (7th Cir. 2008) (court cannot "weigh the evidence or second-guess the jury's credibility determinations"); *United States v. Groves*, 470 F.3d 311, 323-24 (7th Cir. 2006). Furthermore, the government introduced substantially more evidence than just the testimony of Stuart Levine to prove Defendant Rezko's criminal conduct, including extensive corroborating wire taps. When viewing all of the evidence in the light most favorable to the government, the government proved Defendant's knowledge and intent beyond a reasonable doubt. A new trial is not required in the interest of justice.

### 1. Evidence of Knowledge and Intent

The jury convicted Defendant Rezko of participating in a scheme to defraud both the beneficiaries of the TRS and the people of the State of Illinois through the Planning Board. TRS was a public pension plan that provided benefits for teachers employed by the Illinois public schools. TRS had in excess of $30 billion to invest. TRS's Board of Trustees reviewed and voted to approve or deny investment proposals submitted by private investment management companies to manage TRS's funds. The Planning Board reviewed applications for Certificates of Need ("CON") submitted by hospitals and other medical facilities that wanted to build new facilities in Illinois. The State of Illinois required an approved CON before a hospital or other medical facility could begin construction on a new facility. The government proved beyond a

reasonable doubt that Defendant had knowledge of both aspects of the scheme and had the requisite intent to defraud.

> **a.    The Government Proved Beyond a Reasonable Doubt that Rezko Intended to Defraud the Beneficiaries of the TRS**

As established at trial, Defendant had considerable influence with Governor Blagojevich's administration, including influence over the TRS Board.  The evidence established that Defendant got Levine reappointed to the TRS Board, and used Levine to control decisions made by the Board.  Jill Hayden, who worked in the Office of the Governor with the Boards and Commissions, testified that Rezko called her in the Spring of 2004 and told her to reappoint Stuart Levine to the TRS Board.  When she said that she would have to check with Lon Monk, Rezko laughed.  Levine, of course, was reappointed.  Charles Hannon also testified that Rezko advised him that Rezko had been successful in having Levine reappointed to the TRS Board.

Stuart Levine testified about a meeting he had with Defendant Rezko in a private room at the Standard Club on April 14, 2004 where they discussed the scheme to defraud.  The wire taps confirm the meeting.  (Gov. Ex. Call 12, 4/12/2004, at 2; *see also* Gov. Ex. Standard Club 2; Gov. Ex. Standard Club Group.)  Levine testified that during the meeting he informed Rezko of the potential finder's fees from entities seeking TRS investments, and told Rezko that "there was an opportunity for a lot of money to be made."  Levine told Rezko that they had already been successful with the Glencoe Capital and Mercy Hospital transactions.  Levine proposed sharing the finder's fees with Rezko, in exchange for Rezko using his influence with the administration and the various State Boards.  Levine explained to Rezko the specifics of some of the investments, including the potential amount of finder's fees available, and that Dr. Robert Weinstein would share in the fees.  Rezko agreed to the arrangement.

On April 25, 2004, Levine told Dr. Weinstein in a telephone call captured on the wire tap that he had a "great meeting last night" with Rezko where "I got everything all uh, laid out and um, full steam ahead and we're uh, the, the, uh, fair and equitable where everybody participates and uh, full steam ahead and whatever I want." (Gov. Ex. Call 25, 4/15/04.) On an April 17, 2004 telephone call with Weinstein, Levine further discussed the arrangements with "Tony," including that the finder's fees would go first to Weinstein, and that Weinstein would share the fees. (Gov. Ex. Call 196, 4/17/2004.)

### i.      Glencoe Capital

The testimony, documentary, and wire tap evidence showed that Rezko used his influence over the TRS Board to solicit and receive disguised fees and payments in connection with investments approved by the TRS Board. As noted above, Glencoe Capital is one example of Rezko's knowing, active participation in the scheme. The evidence described above demonstrates Rezko's control over the placement of the $250,000 in profits from TRS's investment in Glencoe Capital, and his intent to defraud. This evidence alone supports the jury's verdict — a rational trier of fact could have found Defendant's intent to defraud based on the evidence surrounding the Glencoe Capital transaction.

### ii.      Sterling Venture Financial

TRS's investment in Sterling Venture Financial provides additional evidence of Defendant Rezko's intent to defraud. Mike Winter — who met Defendant in the 1990s, was his social friend, and ultimately worked in Defendant's Rezmar office — testified that Defendant told him in approximately the spring of 2003 that TRS and other state pension funds were investing in real estate funds and "it might be a very good opportunity for me to make qualified

referrals to these various funds" because he would receive a fee for referring business to the funds. Defendant told Winter to contact Stuart Levine to discuss TRS because Mr. Levine "was an intricate part of the TRS Board." Defendant further told Winter that TRS would be "friendly" to his referrals.

Winter had contacts with Sterling Venture Financial, including Danny Rosenberg, and wanted to assist Sterling in getting a TRS investment. Stuart Levine testified that he and Defendant Rezko agreed to assist Sterling in obtaining funds from TRS. Rezko did not intend to share the finder's fee with Levine for this investment. As Levine testified, "I was happy to accommodate him in such things, that he did not have to worry about my asking for a part of anything I helped with, that ultimately, I believed Mr. Rezko would involve me in other and larger deals; and ultimately, I would have a chance to make more money by acting in this fashion than in any other."

Levine testified that Defendant asked him to help Sterling Financial obtain an investment from TRS. Winter and Levine subsequently met. Levine thereafter called Jon Bauman, the Executive Director of the TRS, told Bauman that he would be receiving a call from Mr. Winter, and asked Bauman to "set up a meeting with him and put them through the process." Levine testified that he had previously discussed with Bauman accommodating TRS applications supported by Defendant Rezko.

Both Danny Rosenberg and Mike Winter testified that Winter would receive a finder's fee of one percent of the amount TRS invested with Sterling. Winter testified that he discussed splitting his finder's fee for a Sterling investment with Defendant. Furthermore, Winter testified that Rezko told him that "he thought maybe he should be entitled to a little bit larger percentage

based on the fact that he had to include other people in his portion."

Rosenberg sent Winter a draft consulting agreement on approximately May 5, 2004. Rosenberg testified that Winter was the finder and would receive the finder's fee. (Gov. Ex. Sterling Questionnaire Draft 1; Gov. Ex. Sterling Questionnaire Draft 2.) Shortly after Winter received the draft, he met with Defendant Rezko and Chris Kelly. Winter testified that co-schemer Chris Kelly told him that Winter could not be named as the finder on the Sterling investment because "it would not look good for my name to be disclosed, based on the fact that I officed in Rezmar's offices and shared offices with Mr. Rezko and based on Mr. Rezko's relationship with the Governor." Winter agreed and inserted Myron Cherry's (his personal attorney) name instead, even though Mr. Cherry had not done any work on the Sterling investment. Rosenberg confirmed that Winter told him to include "Myron Cherry & Associates" as the name of the finder. (Gov. Ex. Sterling Questionnaire Final.)

Winter told Defendant that Sterling was not moving fast enough through TRS. Defendant then went to Stuart Levine and told him that Sterling needed to get through. Levine called Jon Bauman. (Gov. Ex. Call 98, 4/30/2004.) Bauman told Levine him that if they submit their application materials, he would make sure that Sterling was placed on TRS's agenda.

Scott Parish, a former private equity investment officer with TRS, told Rosenberg that Sterling would be on the May 2004 agenda at TRS. Parish came for on-site visit on May 18, 2004.

Levine call Bauman on May 20, 2004, and Bauman expressed concerns about the Sterling investment because Myron Cherry's name had been inserted as a finder. Levine encouraged him to get the investment with Sterling passed. That same evening, the FBI went to

Levine's home and informed him that they knew of his fraudulent activities. The next day, May 21, 2004, Levine called Bauman back and informed him that he had "reflected over the evening" and Bauman should do what he thought was best with respect to Sterling. On May 21, 2004, Scott Parish called Rosenberg and informed him that Sterling would not, after all, be on TRS's May 2004 agenda.

### iii. JER

Rezko's role in another aspect of the scheme to defraud the TRS beneficiaries further supports his intent to defraud. In May 2004, TRS ultimately invested $85 million with JER, a Mclean, Virginia real estate company. Clyde Robinson, who worked for JER and was involved in the TRS investment, testified that Ed Chestnut served as a finder for TRS and set up an initial meeting with TRS in late 2003. JER went through the process and the TRS Board approved an $85 million investment with JER in 2004.

Charles Hannon, whose wife had loaned Defendant a substantial amount of money, testified that he told Rezko that he would like to do some consulting work. Hannon explained that he had a conversation with Rezko in Rezko's office in which Rezko told him that Stuart Levine would call him about a finder's fee on the JER investment. Co-schemer Joseph Cari corroborated that Rezko provided Hannon's name for the finder's fee. Levine also testified that Rezko directed him to call Hannon in connection with the JER finder's fee. Clyde Robinson from JER testified that he had never heard of Charles Hannon and that he did not play any role in JER's attempts to get an investment from TRS.

In approximately March or April of 2004, both Levine and Hannon testified about Levine's call to Hannon. During the call, Levine told Hannon that "Tony" had asked him to call,

and asked Hannon if he would be interested in acting as a consultant on an upcoming placement of money. Hannon agreed. Hannon subsequently spoke to Defendant Rezko who informed Hannon that TRS was investing approximately $80 million in a firm and Hannon would receive ten percent of one percent of the amount invested as a finder's fee, or approximately $80,000. Hannon subsequently learned that JER was the name of the firm. Hannon further testified that Rezko told him that he needed to have an Illinois corporation in order to receive the money. Hannon then incorporated Emerald Star International Inc. for that purpose. Defendant Rezko further told Hannon that he had to sign a consultancy contract and that there "was some urgency in getting that contract signed." Hannon did not have to do anything for the finder's fee.

Both Levine and Hannon testified that Levine provided him with a draft contract discussing his "consulting" arrangement. (Gov. Ex. Hannon Fax 1.) Steve Loren also had drafted this sham contract. Hannon admitted that he was going to receive approximately $80,000 for doing nothing. Hannon explained that he asked Defendant Rezko if he could get 15% of the fee, rather than 10%. Rezko, who was controlling the money, told him that he could not have any more money. Ultimately, JER refused to sign the consulting agreement with Emerald, thus Hannon never received any money.

> **b.** **The Evidence Established Beyond A Reasonable Doubt Rezko's Intent to Defraud in Connection with the Planning Board's Passage of the Mercy Application**

Viewing the evidence in the light most favorable to the government, Defendant Rezko controlled the Planning Board and intended to defraud the people of the State of Illinois as charged in the Indictment. The evidence established that Rezko controlled five of the nine members on the Planning Board — Thomas Beck, Dr. Imad Almanaseer, Stuart Levine, Dr.

Fortunee Massuda, and Dr. Michelle Malek. (*See e.g.*, Gov. Ex. Planning Board Sheet). Thomas Beck testified that he had served on the Planning Board since the mid 1990's. When Governor Blagojevich was elected, Beck contacted Tony Rezko on approximately July 15, 2003, to discuss being reappointed to the Board. Beck made an appointment, went to Rezko's office, brought him a check for $1,000 payable to Friends of Blagojevich, and told Rezko that he would appreciate it if Rezko could "put a good word in for me" to be re-appointed to the Board. Several weeks later, Beck testified that Rezko called him and informed Beck that he would be reappointed to the Planning Board, that Stuart Levine would be reappointed, and that the Governor wanted Beck to be Chairman of the Board. Rezko also told Beck that Levine would serve as the Vice Chairman of the Planning Board, and that three of Rezko's friends who are doctors — Dr. Almanaseer, Dr. Massuda, and Dr. Malek — would also be appointed to the Planning Board.

Similarly, Dr. Alamanaseer — who previously had invested in one of Defendant's businesses — testified how he told Rezko that he would be interested in serving on the "CON" board, and Rezko made it happen in approximately August of 2003. Once he became a board member, Beck told Dr. Alamanaseer that if he did not know how to vote on a particular CON application, to "vote the way Mr. Levine votes because that's how Tony would want the vote to go." When Almanaseer subsequently told Defendant about Beck's comments, Defendant simply laughed and changed the subject.

The evidence further demonstrated that Defendant Rezko used his influence on the Planning Board to get Mercy Hospital's CON application for a new hospital in Crystal Lake, Illinois passed in order to obtain a kickback with Levine from Joseph Kiferbaum. Specifically,

Rezko used his influence to have the Mercy Hospital CON passed at the April 21, 2004 Planning Board meeting. Kiferbaum Construction wanted to build the new hospital. Co-schemer Joseph Kiferbaum[4] of Kiferbaum Construction approached Levine — to whom he had previously paid bribes in exchange for business — about getting a CON for Mercy Hospital in exchange for receiving a bribe because Mercy needed the CON in order for Kiferbaum Construction to build the new hospital. Levine then called Tom Beck, the Chairman of the Planning Board, about the Mercy Hospital CON. Beck informed him that the Planning Board previously had issued an intent-to-deny Mercy's application. Beck and Levine both testified that Beck initially told Levine that the CON was not very good and that Rezko opposed it. Steve Loren corroborated this testimony — he testified that Levine told him that Rezko was against the Mercy CON.

Levine thereafter approached Rezko. Levine testified that he informed Rezko that he and Rezko could make money if the Planning Board approved the Mercy CON application, and "Kiferbaum would be capable of raising significant political contributions for the — for Governor Balgojevich, in addition to paying a substantial bribe for getting the CON." Levine testified that Rezko agreed to help get the CON application approved in exchange for a portion of the bribe money Kiferbaum agreed to pay and for Kiferbaums' promise to help raise money for the Governor. Levine and Rezko also agreed to keep the financial arrangement to themselves, as Levine testified.

On April 14, 2004, Levine testified that he discussed the Mercy CON application with Rezko at the Standard Club. He testified that they discussed splitting the bribe money from

---

[4] Jacob Kiferbaum pled guilty in a related case on June 20, 2005, and entered a written plea agreement with the government. (*United States v. Kiferbaum*, 05 CR 408, R. 52-1).

Kiferbaum 50/50 if the CON passed. Rezko agreed to speak to Beck and get the application passed.

After April 14, 2004 and prior to the April 21, 2004 Planning Board meeting, Beck testified that he spoke with Rezko about the Mercy Hospital application for a CON, as well as the other agenda items. During this conversation, Rezko told Beck that he now favored approval of the Mercy CON application even though Beck informed Rezko that he did not think the application was good enough to be approved. Beck thereafter spoke with Levine. That call was captured on the wire tap. (Gov. Ex. Call 257, 4/19/2004.) During that call, Beck told Levine: "I've got the marching orders" and "there's one I think you may be able to help us .... Mercy Hospital.... Our boy wants to help him." (*Id.* at 4.) As Beck testified, he informed Levine that Rezko wanted to get Mercy Hospital approved. (*See also* Gov. Ex. Call 277, 4/19/2004 at 3.)

Beck testified that he told Levine right before the April 21, 2004 meeting that he could not go along with Mercy because it was not a good application, and Levine got Rezko on the phone. Rezko then told Beck to "do what he had to do" to get the application approved. The phone records corroborate the placement of these calls.

Dr. Almanaseer testified that Beck approached him before the April 21, 2004 meeting commenced, and told him that Rezko wanted the Mercy Hospital CON approved. When Dr. Almanaseer inquired about the change in Rezko's position, Beck told him that "that's how Tony wants it." Although Dr. Alamanaseer attempted to contact Rezko on his cell phone, he was unsuccessful.

The evidence regarding the April 21, 2004 Planning Board meeting further corroborates Rezko's knowledge of the scheme and intent to defraud. Beck, Levine, Almanaseer, Ann

Murphy, and Annamarie York all testified about the highly unusual events that occurred at the meeting. Stuart Levine, Dr. Massuda and Dr. Malek all voted to pass the Mercy Hospital CON application, two members voted to deny it, and two members – including Dr. Almanaseer – voted to "pass" on voting. When it was Beck's turn to vote, he got up and walked over to talk to Stuart Levine privately. Levine then went to Dr. Almanaseer and came back and reported to Beck that Dr. Almanaseer was changing his vote to "yes." Dr. Almanaseer and Levine both testified that Levine whispered to Almanaseer that Rezko wanted him to vote "yes" on the project.

Beck then voted to approve the Mercy CON, and Dr. Almanaseer changed his "pass" vote to a 'yes." Because the five members controlled by Rezko voted yes, the Mercy CON passed. Ms. Murphy, the General Counsel to the Planning Board, testified that at that point, "there was an audible collective shared gasp heard throughout the room." Indeed, she testified that the "procedure had been highly irregular." When Ms. Murphy questioned Levine after the vote, he told her that "sometimes you have to be a good soldier."

Beck and Levine went to Rezko's office after the vote and informed him that the Planning Board had approved the Mercy Hospital project. Rezko told Beck not to worry about it and that "we'll take care of Ed and Jeff next time.[5]"

After the meeting, Levine talked to co-schemer Robert Weinstein. That call was captured on the wire tap. (Gov. Ex. Call 328, 4/21/04.) Levine bragged to Weinstein about what had happened, and told him that the application passed because "Tony and I both decided you know I

---

[5] Jeff Ladd represented Mercy's competitor, Centegra. Ladd hired Rezko's friend, Ed Kelly, to ensure that the Mercy CON application did not pass through the Planning Board. Ladd told Kelly to keep Rezko out of the vote and away from the Planning Board.

like to get things done." (*Id.* at 2.)  He further told Weinstein that "They know Tony's givin' the orders." (*Id.*)  Levine also explained to Weinstein how the voting took place, including that he had to talk to Almanaseer to change his vote.  (*Id.* at 2-3.)

Approximately one month later, Defendant Rezko and Stuart Levine had a phone conversation that the FBI taped through the wire tap on Levine's phone.  During that call, they discussed the Planning Board and reaffirmed the role that Beck played for them.  Rezko acknowledged that he preferred to "keep it through Tom Beck" because "I need that board to be, the focus to be Tom."  (Gov. Ex. Call 1011, 5/18/2004, at 1-2.)  Rezko confirmed with Levine the same process that they followed with the Mercy Hospital CON application — "it should be Tom communicating with the others."  (*Id.* at 2.)  Further, Rezko confirmed the process, "I will go over things and when Tom comes in, Tom will carry uh, the ball and nobody will know.  Tom should not know you and I are having this conversation."  (*Id.* at 3.)

This evidence overwhelmingly proves Rezko's knowledge of the scheme and his intent to defraud, as well as his active role in the scheme to defraud.  Defendant's motion is denied.

Defendant Rezko argues that the Court should "consider why the government never called Weinstein" to testify about the charged scheme.  (R. 629-1, at 9.)  The Court, however, must view all of the evidence introduced at trial in the light most favorable to the government, not speculate as to why the government did not call certain witnesses to testify.  Furthermore, the Court notes that Robert Weinstein faces criminal charges for allegedly engaging in a scheme to defraud with Levine, thus explaining one likely reason the government did not call Weinstein to testify at trial.  (*See* 08 CR 515, R.1-1, Indictment, Honorable Ruben Castillo.)

## 2.     404(b) Evidence Regarding Intent

The testimony of Ali Ata provided further evidence of Defendant's intent to defraud. The Court admitted Ata's testimony pursuant to Federal Rule of Evidence 404(b) as evidence of Defendant's knowledge, intent, and lack of mistake.[6]  Courts can admit evidence of other bad acts pursuant to Federal Rule of Evidence 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake."  Fed. R. Evid. 404(b).  *See also United States v. Hearn*, 534 F.3d 706, 712 (7th Cir. 2008); *United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007) (evidence admissible to show intent where intent at issue); *United States v. Mallett*, 496 F.3d 798, 802 (7th Cir. 2007) (same).

Ali Ata testified at trial pursuant to a cooperation agreement with the government.  Ata was the Executive Director of the Illinois Finance Authority ("IFA"), an Illinois State agency that provides loans to businesses.  Ata testified that Defendant Rezko got Ata his job as Executive Director of IFA subsequent to Ata making two separate $25,000 contributions to Governor Blajogevich.  Rezko offered him the job in October or November of 2003, and Ata accepted it.  While serving as Executive Director, Defendant Rezko went to Ata and told him that he wanted the IFA to guarantee $8 million in financing for the acquisition of his Papa John's pizza restaurants in Chicago.  Ata told Rezko that the guarantee was a concern because it would generate negative publicity to the IFA and to the Governor's office and because of the association of the business with Defendant Rezko.  In response, Rezko told Ata that he would get the Governor's office to approve the transaction and that "as far as the board, [Rezko] said we put them there," thus the board would support the transaction.

---

[6] The Court instructed the jury that it could consider this evidence "only on the question of Defendant's knowledge, intent, and lack of mistake."  (R. 543-1 at 13.)

In late February 2004 — right in the middle of the scheme at TRS — Defendant called

Ata and told him that he needed a letter on IFA letterhead, and dictated to Ata the content for the

letter. Ata prepared the letter. (Gov. Ex. Ata Letter.) The letter, signed by Ata, stated: "please

be informed that your request for financing the acquisition of Papa John's stores in the Chicago

and Milwaukee markets will be recommended for approval by the board of directors of the

Illinois Finance Authority (IFA), on March 15, 2004. IFA will guarantee 50 percent of the total

acquisition cost of $16 million." (*Id.*) Ata gave the letter to Rezko, but Rezko told Ata that he

would not use the letter. Nonetheless, Defendant did use the letter to help with financing for his

restaurants. This evidence regarding the IFA demonstrates Rezko's intent to defraud and to use

his influence with state boards for his own benefit.

### 3. Evidence Regarding Attempts to Conceal the Fraud

The law is clear that an attempt to cover up or conceal actions is evidence of

consciousness of guilt and guilt itself. *See United States v. Webber*, 536 F.3d 584, 598 (7th Cir.

2008) (holding that evidence of attempt to conceal was "circumstantial evidence of [defendant's]

consciousness of guilt"); *United States. v. Skoczen* 405 F.3d 537, 548 (7th Cir. 2005) ("Evidence

of ... concealment may be admissible to show consciousness of guilt, as well as guilt itself").

During the trial, the government introduced extensive evidence of Defendant's efforts at

concealment.

First, several witnesses testified that Defendant had electrical equipment to detect

listening devices in his office. Ali Ata, for example, testified that Defendant told him that he had

hired a service to search his office for "bugs" and that he had "little electronic boxes that were

detectors for bugs." Ata testified that Rezko was using the boxes to detect any listening or

recording devices at his office.

Mike Winter, who worked in Defendant's Rezmar office, also testified about these devices. Winter walked into Defendant's office one day and heard a beeping noise. When he asked Defendant about the noise, Defendant told him that it was a device that could "detect if somebody was listening in to a conversation." Furthermore, Chuck Hannon testified that Rezko told him that he periodically had professionals come into his office and sweep his office to see if his phones were tapped.

Second, the government introduced evidence to have the United States Attorney in the Northern District of Illinois removed so he could no longer prosecute Rezko and similar cases. Ata testified that he spoke with Defendant Rezko at Rezko's office regarding a change in the United States Attorney's Office. Rezko told him that he had just finished meeting with Mr. Kjellander — whom he described as a "top GOP operative" — and that there would be a change in the United States Attorney's office in Chicago. He said that Mr. Kjellander would talk to the Chief Advisor to the President of the United States and make the change happen.

Further corroborating Ata's testimony, Eli Maloof testified that Rezko told him not to mention Rezko's name to the government and not to worry because the United State Attorney in Chicago was going to be replaced. Once the United States Attorney was replaced, the investigation would be over.

Third, Rezko instructed witnesses who had been subpoenaed or approached by the government not to talk to the government and not to mention his name to the government. Ata testified about a conversation that he had with Defendant Rezko in Ata's car in 2005. Defendant Rezko asked Ata if the FBI had approached him. Rezko told him that the FBI had been

approaching people and that "he's got people throwing themselves at the feet of the authorities to cooperate; and those who do will be dealt with."

In addition, Eli Maloof went to Rezko and told him that he had been subpoenaed by the government. Rezko told Maloof not to talk to the government.

On May 20, 2004, the FBI went to Steve Loren's home and told him that they wanted to talk to him about "some ex parte communications involving Levine and Health Facility Planning Board." They also had tapes from the wire tap to play for Loren. In August 2004, Mr. Bauman told Mr. Loren that he would no longer be representing TRS. That same day, Loren testified that he called co-conspirator Bill Cellini and they discussed the federal investigation. Cellini told Loren that he "had been in contact with Mr. Rezko and both he and Mr. Rezko were trying to go through their recollections of recent conversations they had had with Stuart Levine to see whether they, themselves, had any concerns with respect to their understanding of the government's phone taps."

Semir Sirazi, who did consulting work for some of Defendant's businesses, testified that in approximately late fall of 2004, he met with Rezko. Rezko told Sirazi that if the government approached him, Sirazi should let Rezko know. After an IRS agent contacted Sirazi, Rezko told Sirazi they may need to create a sham, backdated contract to make it look like he did the consulting services for Joe Aramanda.

Viewing all of the evidence in the light most favorable to the government, the government proved Defendant's intent and knowledge beyond a reasonable doubt.

### B. The Government Proved the Mailing in Count 11 Beyond a Reasonable Doubt

Defendant argues that the government failed to prove a mailing in connection with the

mail fraud charged in Count 11 of the Indictment.  The Court disagrees.

Count 11 charged Defendant with mail fraud.  The mailing at issue in this count was an envelope containing a letter from Joseph Kiferbaum to Mercy Hospital soliciting a construction contract for the proposed hospital and offering to help Mercy get approval from the Planning Board.  The Indictment alleges that the mailing took place on or about November 25, 2003, and was addressed to Mercy Hospital in Woodstock, Illinois.

The law is clear that a defendant need not personally mail the mailing at issue in the charge.  *United States v. Hickok*, 77 F.3d 992, 1004 (7th Cir. 1996) (citations omitted).  The government must prove that the defendant knowingly caused the mails to be used in furtherance of a scheme to defraud.  *Id.* (quoting *United States v. Brocksmith,* 991 F.2d 1363, 1367 (7th Cir. 1993)).  The government can prove the mailing at issue through direct or circumstantial evidence,  *United States v. Szarwark*, 168 F.3d 993, 995-96 (7th Cir. 1999); *United States v. Ledesma,* 632 F.2d 670, 675 (7th Cir. 1980), and need not introduce the envelope used for the mailing.  *Ledesma,* 632 F.2d at 675 ("It is of course true that the introduction of the envelope in which the correspondence was mailed would have been strong direct evidence of mailings, but testimony as to office practice is sufficient proof of mailing.").  Evidence that mailings occur in the usual course of business is ordinarily sufficient to show that a particular transmission occurred on a given occasion.  *See United States v. Ratliff-White*, 493 F.3d 812, 818 (7th Cir. 2007); *United States v. Swinson*, 993 F.2d 1299, 1301 (7th Cir. 1993); *Szarwark*, 168 F.3d at 996; *United States v. Mankarious*, 151 F.3d 694, 702-3 (7th Cir. 1998); *United States v. Keplinger*, 776 F.2d 678, 690-91 (7th Cir. 1985).

Here, the government introduced sufficient evidence from which a rational trier of fact

could have found beyond a reasonable doubt that a mailing occurred on or about November 25, 2003. As an initial matter, the letter was introduced at trial. (Gov. Ex. 11-25-03 Kiferbaum Letter). During the trial, Rhonda Howard, Jacob Kiferbaum's executive assistant, testified about the mailing. Ms. Howard testified that the November 25, 2003 letter was a standard letter that Kiferbaum Construction mailed to potential clients after their initial meeting, thanking the client for the time they spent considering Kiferbaum Construction. Ms. Howard further testified that Kiferbaum Construction routinely mailed letters like the November 25, 2003 letter, after meeting with potential clients.

Ms. Howard testified that she did not prepare the November 25, 2003 letter. Nonetheless, as Mr. Kiferbaum's executive assistant, she was familiar with the normal practice of Kiferbaum Construction to mail such letters through the United States mails. She testified that "standard follow-up" letters like the November 25, 2003 letter were routinely sent through the United States mail. Ms. Howard further testified that if the letter did not have any attachments such as a brochure, Kiferbaum Construction would have sent it through the mail. Ms. Howard also testified that the November 25, 2003 letter did not have any documents attached to it and did not have any indication at the bottom of the letter that it included any attachments. Thus, as the standard practice called for, the ordinary practice would have been to send the November 25, 2003 letter to Mercy Hospital through the United States mails. Viewing the evidence in the light most favorable to the government, a rational juror could have found that the November 25, 2003 letter was sent through the United States mails to Mercy Hospital.

Defendant's reliance on *United States v. Brooks*, 748 F.2d 1199, 1203 (7th Cir. 1984), fails. In *Brooks*, the Seventh Circuit reversed a mail fraud conviction where the testimony at

trial only proved a probability that the mails had been used.  The only testimony regarding one of the mailings was that it was date-stamped.  The witness, however, conceded that both mailed letters and items received from private couriers were date stamped.  This evidence was insufficient.  Regarding the second mailing, the Seventh Circuit reversed because the witness testified that they typically received forms like the mailing at issue through the mails.  There was no testimony regarding the practice of the sender of the form.  In contrast, in this case, Ms. Howard provided clear testimony that it was the routine practice of Kiferbaum Construction to mail letters such as the one at issue in Count 11.

## CONCLUSION

For the reasons discussed above, the Court denies Defendant Rezko's motion for judgment of acquittal and motion for a new trial.

Dated:  November 12,  2008                    ENTERED:


                                                              AMY J. ST. EVE
                                                              United States District Court Judge