UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 CR 691 |
| | ) | |
| ANTOIN REZKO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Rezko moves for a new trial based on the Supreme Court's recent decisions in *Skilling v. United States*, __ U.S. __, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), and *Black v. United States*, __ U.S. __, 130 S.Ct. 2963, 177 L.Ed.2d 695 (2010). Defendant's motion is denied.

## BACKGROUND

On June 4, 2008, a jury convicted Defendant Antoin Rezko of sixteen counts charged in the Superseding Indictment after over three months of trial and over two weeks of jury deliberations. Specifically, the jury convicted Defendant on twelve counts of honest services fraud (Counts 1, 2, 4-6, 7-8, and 11-15), two counts of aiding and abetting bribery (Counts 17 and 20), and two counts of money laundering (Counts 23 and 24). The jury acquitted Defendant Rezko on eight separate counts, including three honest services fraud counts (Counts 3, 9, 10), four bribery counts (Counts 18, 19, 21, 22), and attempted extortion (Count 16).

The jury convicted Defendant Rezko for participating in a scheme to defraud the people of the State of Illinois that he carried out with Stuart Levine and others. Specifically, Defendant Rezko was convicted of using his influence with Governor Rod Blagojevich's administration and Stuart Levine's membership on two State of Illinois boards to influence the actions of these boards for private gain. Stuart Levine was a member of both 1) the Board of Trustees of the Teacher's Retirement System of the State of Illinois ("TRS"), a public pension plan that provided benefits for teachers employed by the Illinois public schools, and 2) the Illinois Health Facilities Planning Board ("Planning Board"), an Illinois State board that reviewed applications submitted by hospitals that wanted to build new facilities in Illinois. The jury convicted Rezko of defrauding the beneficiaries of TRS and the people of the State of Illinois of the honest services of Stuart Levine as a board member of TRS and the Planning Board. Rezko and Levine further used Rezko's influence with the Blagojevich administration and Levine's roles on these boards to influence the actions of TRS and the Planning Board for the benefit of themselves and others, and to carry out the scheme. The jury also convicted Defendant Rezko of two counts of aiding and abetting bribery (Counts 17 and 20). Both of the bribery counts had corresponding honest services fraud counts. In addition, the jury convicted Defendant of two counts of money laundering – Counts 23 and 24 – that related to the transaction underlying the honest services fraud convictions charged in counts 1 and 2.

On November 12, 2008, the Court denied Defendant Rezko's motion for judgment of acquittal or in the alternative for a new trial. (R. 632.) Defendant subsequently asked the Court to strike the January 6, 2009 sentencing date. (R. 646.) Since that time, the parties have repeatedly asked the Court to delay Defendant's sentencing date, presumably because of

Defendant's potential cooperative efforts. On November 4, 2010, Defendant asked for a sentencing date, although the parties subsequently jointly asked the Court to strike the date and move it to the Fall[1]. On November 18, 2010, Defendant filed another motion for a new trial pursuant to Federal Rule of Civil Procedure 33 based on the Supreme Court's rulings regarding honest services fraud in *Skilling v. United States*, __ U.S. __, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), and *Black v. United States*, __ U.S. __, 130 S.Ct. 2963, 177 L.Ed.2d 695 (2010). After the parties briefed the motion, the Court held oral argument on January 28, 2010.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005). A court may also grant a new trial "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Eberhart,* 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds by Eberhart v. United States*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005).

## ANALYSIS

Defendant argues that he is entitled to a new trial based on the Supreme Court's recent opinions in *Skilling v. United States*, 130 S.Ct. 2896, 2931 (2010), and *Black v. United States*, 130 S.Ct. 2963, 2968 (2010) because one of the honest services fraud jury instructions given at his trial was erroneous in light of the change in law. Defendant further argues that the error was

---

[1] At the parties request, the Court set the new sentencing date for October 21, 2011, after the retrial of Blagojevich and the trial of William Cellini.

not harmless because it enabled the jury to convict him on an honest services fraud theory that the Supreme Court has declared is no longer good law.

**I.     Timeliness of the Motion**

Before proceeding to the merits of Defendant's motion, the Court first addresses the timing of it.  Under Federal Rule of Criminal Procedure 33, a defendant must file a motion for a new trial within fourteen days after the guilty verdict if the motion is not grounded on newly discovered evidence.  *See* Fed.R.Crim.P. 33(b)(2).  The parties do not dispute that Defendant Rezko failed to file his new post-trial motion within fourteen days of the June 4, 2008 jury verdict.  Given that the Supreme Court's rulings upon which Defendant relies did not issue until June 24, 2010, Defendant could not have filed this motion fourteen days after the verdict. Defendant instead filed the motion on November 18, 2010, approximately five months after the Supreme Court's ruling in *Skilling* and *Black*, and three weeks after the Seventh Circuit's ruling on the *Black* remand from the Supreme Court.  Defendant informed the Court and the government of his intention to file such a motion on November 4, 2010 – six days after the Seventh Circuit's opinion in *Black*.

The government argues that the motion is untimely because Rezko made a strategic decision to delay the filing and that the decision does not constitute "excusable neglect" justifying its delay.  According to the government, "nothing prevented Rezko from filing his motion promptly after the Supreme Court issued its decision" in *Black* and "there was no reason to expect that the decision on remand in that case would provide guidance regarding the honest services instructions in this case."  (R. 709, Sur-reply at 2.)

4

Defendant maintains that because the Court granted him leave to file the new post-trial motion at the November 4, 2010 status hearing, the Court extended the time for the post-trial motion on its own initiative. In support of this argument, Defendant relies on Rule 45(b)(1), which states:

> (1) When an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made:
>> (A) before the originally prescribed or previously extended time expires; or
>> (B) after the time expires if the party failed to act because of excusable neglect.

Fed.R.Crim.P. 45(b)(1). Contrary to Defendant's assertion, the Court's minute entry allowing him to file the present post-trial motion does not amount to the Court acting "on its own" to "extend the time" period, especially because the parties did not raise any timeliness issues at the November 4, 2010 status hearing.

In the alternative, Defendant argues that his post-trial motion is timely because it was the result of excusable neglect pursuant to Rule 45(b)(1). "The Supreme Court in *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship,* 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) listed the factors a district court should consider when evaluating a claim of excusable neglect, which include the danger of prejudice to the defendant, and the reason for the delay." *Murphy v. Eddie Murphy Prods., Inc.,* 611 F.3d 322, 324 (7th Cir. 2010); *see also Raymond v. Ameritech Corp.,* 442 F.3d 600, 606 (7th Cir. 2006) ("We have held that *Pioneer* applies whenever "excusable neglect" appears in the federal procedural rules."). More specifically, the "standard for reviewing whether neglect was 'excusable' is an equitable one, taking into consideration relevant circumstances, including (1) the danger of prejudice to the non-moving

party; (2) the length of the delay and its impact on judicial proceedings; (3) the reason for the delay (i.e., whether it was within the reasonable control of the movant); and (4) whether the movant acted in good faith." *McCarty v. Astrue,* 528 F.3d 541, 544 (7th Cir. 2008); *see also Pioneer Inv. Servs.,* 507 U.S. at 395 (determination of excusable neglect is "an equitable one, taking account of all relevant circumstances surrounding the party's omission."). Appellate review of a district court's excusable neglect determination is for an abuse of discretion. *See McCarty,* 528 F.3d at 544; *Raymond,* 442 F.3d at 606.

Defendant Rezko argues that the reason for his delay under the first *Pioneer* factor weighs in his favor because he has been cooperating with the government and agreed to delay sentencing while remaining incarcerated. Moreover, during the two years he has been incarcerated, the Supreme Court narrowed the scope of the honest services fraud statute, 18 U.S.C. § 1346, upon which he was convicted. *See Skilling v. United States*, 561 U.S. ___, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), and *Black v. United States,* 561 U.S. ___, 130 S.Ct. 2963, 177 L.Ed.2d 695 (2010). The government, however, points out that the length of delay in filing the present motion was within Defendant's control because the Supreme Court decided *Skilling* and *Black* on June 24, 2010, yet Defendant did not file the present motion until November 18, 2010. Defense counsel explain that they waited until the Seventh Circuit's October 29, 2010 decision in *Black* so that they could determine what, if any relief, was available to Defendant. Defense counsels' argument has some merit because the Seventh Circuit's decision in *Black* provided guidance to the Court in applying the *Black* and *Skilling* holdings.

The government argues that the reason for Defendant's delay in filing his post-trial motion was the result of a strategic decision relating to his upcoming sentencing hearing and to

his attempt "to maximize the government's interest in utilizing him as a witness in return for a sentencing reduction." (R. 709, Sur-reply at 3.) Because the Court rescheduled Defendant's sentencing hearing for later this year, any concern that Defendant's timing was strategic based on the requested January sentencing date is no longer at issue. Moreover, even if the reasons for Defendant's delay are questionable, "*Pioneer* makes clear that the standard is a balancing test, meaning that a delay might be excused even where the reasons for the delay are not particularly compelling." *United States v. Brown,* 133 F.3d 993, 997 (7th Cir. 1998).

Next, the government maintains that this delay is prejudicial under the first *Pioneer* factor. The government specifically argues that Defendant's delay carries the possibility that the re-trying of this criminal matter would be more difficult due to the passage of time. *See United States v. Munoz,* 605 F.3d 359, 371 (6th Cir. 2010) ("proper inquiry is the potential prejudice stemming from having to *retry the case* after a delay, rather than merely from having to respond to a belated motion") (emphasis in original); *Murphy*, 611 F.3d at 324 ("defendants would suffer prejudice from delaying the resolution of this case"). The government has not, however, identified how the five month time period between the *Skilling* and *Black* decisions and Defendant's filing of this motion is prejudicial. Further, the other *Pioneer* factors, including the interests of efficient judicial administration, weigh strongly in favor of permitting this late motion. *See Pioneer,* 507 U.S. at 398; *Brown*, 133 F.3d at 996. Deciding the present post-trial motion on the merits serves the interests of judicial economy for appellate purposes, namely, Defendant will be able to appeal all of the relevant issues in one appeal. Based on the weighing of the *Pioneer* factors and the unusual circumstances in this matter given the timing of the Supreme Court's decisions narrowing the honest services statute, Defendant has established that

the timing of his post-trial motion was the result of excusable neglect under Rule 45(b)(1)(B).

## II. Instructions

The Supreme Court addressed the scope and constitutionality of Section 1346 in *Skilling v. United States* and *Black v. United States.* In reaching its holding, the Supreme Court reviewed the history of the honest services statute based on case law pre-dating *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and noted that the "'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Skilling*, 130 S.Ct. at 2927-28. Based on this history and to "preserve the statute without transgressing constitutional limitations," the Supreme Court held that "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-McNally case law." *Id. See also United States v. Boone*, 628F.3d 927, 929 (7th Cir. 2010) (noting that the Supreme Court held that "in order to avoid vagueness problems, § 1346 must be read as criminalizing *only* bribery and kickback schemes.").

The Supreme Court noted that the honest services "prohibition on bribes and kickbacks draws content not only from the pre- *McNally* case law, but also from federal statutes proscribing-and-defining-similar crimes." *Skilling*, 130 S.Ct. at 2933. Although the Supreme Court did not define the types of bribery and kickback schemes that the honest services statute prohibits, it specifically referenced 18 U.S.C. §§ 201(b), 666(a)(2) and 41 U.S.C. § 52(2), as well as pre-*McNally* case law relying on bribery and kickback schemes. Section 201(b) of Title 18 provides that bribery of public officials occurs where an individual "directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who

8

has been selected to be a public official to give anything of value to any other person or entity, with intent ... to influence any official act; or ... to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official person." Similarly, anyone who is a public official or a person selected to be a public official who, "directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for ... being influenced in the performance of any official act ... or being induced to do or omit to do any act in violation of the official duty of such official or person" commits bribery. 18 U.S.C. § 201(b)(2).

Section 666(a)(2) of Title 18 provides that an individual commits bribery if he:

> corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent ... of a State ... in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2). *See generally United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009).

Finally, 41 U.S.C. § 52(2) provides:

> "The term 'kickback' means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]."

The Supreme Court also cited several cases as defining the scope of the honest services statute on prohibiting bribes and kickbacks, including *United States v. Ganim,* 510 F.3d 134, 147-149 (2d Cir. 2007)(Sotomayor, J.), *United States v. Whitfield,* 590 F.3d 325, 352-353 (5th Cir. 2009), and *United States v. Kemp,* 500 F.3d 257, 281-286 (3d Cir. 2007). *Skilling,* 130 S.Ct. at 2934 (2010). These cases involved honest services fraud involving bribery and payments made in

exchange for a promise to perform an official act.

Because the indictment in *Skilling* involved three objects of the charged conspiracy – honest services fraud, money or property fraud and securities fraud – the Supreme Court remanded the case for the court to conduct a harmless error analysis. Similarly, because the honest services counts of conviction in *Black* each carried both a pecuniary fraud and honest services fraud theory, the Supreme Court remanded the case to the Seventh Circuit to conduct a harmless error analysis.

### A.     The Instruction at Issue

Based on the Supreme Court's holding in *Skilling*, Defendant Rezko challenges the following instruction to the jury:

> A public official or employee deprives the public or his employer of his honest services when he misuses his position, or the information he obtains in it, for the purpose of illegitimately obtaining gain for himself or another.

(R. 543, Jury Instructions, at 29.) Defendant argues that this instruction was erroneous because the Court did not instruct the jury that payment of a bribe or kickback was an essential element of honest services fraud. The Court agrees – on its face, the instruction did not require the jurors to find that the charged scheme involved bribery or kickbacks.

The government contends, however, that the instruction is not erroneous because this instruction, unlike the one in *Black*, required the jury to find that the official misused his position in order to "illegitimately obtain[] gain." Looking solely at the instruction, this language does not cure the legal defect because the jury was never instructed that the fraud had to involve a bribe or kickback scheme. As such, the instruction was erroneous under *Skilling* and *Black*.

## B.     Harmless Error Analysis

An erroneous jury instruction does not automatically mandate a new trial. Instead, the question becomes whether the instructional error was harmless. In *Hedgpeth v. Pulido*, 129 S. Ct. 530, 531 (2008), the Supreme Court noted that "a reviewing court finding such error should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth*, 555 U.S. 57, 129 S.C. 530, 531 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). "On harmless-error review, the government has the burden of establishing that it is clear beyond a reasonable doubt that the jury would have convicted absent the error." *United States v. L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009), citing *United States v. Mansoori*, 480 F.3d 514, 523 (7th Cir.2007). *See also United States v. Ramirez,* 574 F.3d 869, 884 (7th Cir. 2009).

The Seventh Circuit recently applied the harmless error standard in *United States v. Black*, 625 F.3d 386, 388 (7th Cir. 2010). A jury convicted Conrad Black of three fraud counts and one count of obstruction of justice. Each fraud count had both an honest services theory and pecuniary fraud theory associated with it. Because the jury returned a general verdict rather than a special verdict form, it was unclear under which theory the jury had convicted Black.

The Supreme Court in *Black v. United States*, 130 S.Ct. 2963 (2010) -- a companion case with *Skilling* -- found that the jury instruction regarding the honest services charges was incorrect because it did not make clear that the honest services statue only criminalizes schemes to defraud that involve bribes or kickbacks. The Supreme Court "express[ed] no opinion on the question whether the error was ultimately harmless," and remanded the case to the Seventh Circuit to make that determination. On remand, in assessing whether the erroneous jury

instruction was harmless, the Seventh Circuit noted: "But if it is not open to reasonable doubt that a reasonable jury would have convicted them of pecuniary fraud, the convictions of the fraud counts will stand." *Black*, 625 F.3d at 388. The question, noted the Seventh Circuit, was "whether a reasonable jury might have convicted the defendants of depriving the company of their honest services for private gain but not have convicted them of pecuniary fraud." *Id*. at 392. The Seventh Circuit ultimately reversed Conrad Black's conviction on two fraud counts, and held that no reasonable jury could have acquitted the defendant of pecuniary fraud on one of the counts but convicted them of honest services fraud on that count. *Id.* at 393.

In *United States v. Cantrell*, 617 F.3d 919 (2010), the Seventh Circuit noted that the Supreme Court had issued its honest services ruling in *Skilling* while the *Cantrell* appeal had been pending. A jury had convicted Cantrell of honest services fraud, among other crimes. The Seventh Circuit found that it "was clearly a kickback scheme, so §1346 – even as pared down by *Skilling* – applies to Cantrell." 617 F.3d at 921. Similarly, in *United States v. Lupton*, 620 F.3d 790, 803 n.3 (7th Cir. 2010), the Seventh Circuit found that *Skilling* did not alter the outcome of Lupton's honest services conviction because "Lupton's scheme constitutes not a mere failure to disclose a conflict of interest ... but rather the 'paradigmatic kickback fact pattern,' ... that remains within the ambit of § 1346...." (quoting *Skilling* at 2930). Recently, the Seventh Circuit noted that the *Skilling* holding did not impact the honest services fraud conviction in a case that "ivolve[d] precisely the type of claim that the Court retained. The allegations were that a payment was made in order to obtain the services that the alderman's office is supposed to provide. Thus, the allegations underlying the honest services conviction in this case involved the type of bribery conduct that the Court preserved in *Skilling*, and which constitutes criminal

conduct under § 1346." *Boone*, 682 F.3d at 929.

### III. No Reasonable Jury Would Have Convicted Defendant Rezko of the Honest Services Fraud Without Finding that he Engaged in a Scheme Involving Bribes and Kickbacks

In contrast to the case against Conrad Black, here, the government only pursued an honest services theory on the fraud counts of conviction. The government did not pursue a corresponding pecuniary fraud theory on any of these counts. Thus, as one court recently explained, "the relevant inquiry is whether a reasonable jury, properly instructed, must necessarily have convicted based on a proper theory." *Ryan v. United States*, ___ F.Supp.2d ___, 2010 WL 5495015, at *14 (N.D. Ill. Dec. 21, 2010). In reaching this decision, the Court looks to the charges in the indictment, the evidence and the arguments made at trial. The Court also looks to the jury's actual findings. *See Black*, 625 F.3d at 393 (noting jury's split verdict finding that the "only rational explanation for the split verdict is that the jury believed that the $600,000 that the defendants received from Forum-Paxton without covenants not to compete, unlike the other transactions with that company, were proceeds of a plain-vanilla pecuniary fraud-and only a pecuniary fraud. For had the jury believed that a failure to disclose the fees for promising not to compete with the little newspapers was honest-services fraud, it would have convicted the defendants on all the fraud counts, because the defendants disclosed those fees neither to the board nor to the shareholders; and the jury didn't do that."). *See also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("Harmless-error review looks, we have said, to the basis on which 'the jury *actually* rested its verdict.'") (quoting *Yates v. Evatt*, 500 U.S. 391, 404 (1991)) (emphasis in original).

As noted above, the jury convicted Defendant Rezko for participating in a scheme to defraud the people of the State of Illinois that he carried out with Stuart Levine, among others. They convicted him of participating with Levine to use Levine's membership and influence on the TRS and the Planning Board in order to obtain money. The Superseding Indictment describes the "overview" of the honest services scheme as follows:

> It was part of the scheme that defendant REZKO and Levine, with the assistance of Cari, Loren, Kiferbaum, Cellini, Kelly, and others, fraudulently used and sought to use the position and influence of Levine and other members of the TRS Board of Trustees and the Planning Board to obtain financial benefits for REZKO, Levine, and their nominees and associates. In the course of the scheme, REZKO and Levine solicited and demanded millions of dollars in undisclosed kickbacks and payments, and received and directed hundreds of thousands of dollars in actual undisclosed kickbacks and payments, for the benefit of REZKO, Levine, and their nominees and associates, from investment firms seeking to do business with TRS, and from Kiferbaum.

(R. 546 at 7.)

The indictment, evidence, and arguments reveal that the government pursued one theory at trial on the honest services charges – that Rezko was guilty because he participated in a kickback scheme to misuse Stuart Levine's position on the state boards in order to obtain money. The theme throughout the trial – supported by the evidence – was that Rezko, Levine and others solicited, demanded and accepted bribes and kickbacks paid by firms in exchange for beneficial actions taken by Levine as a member of the TRS board and the Planning Board. Even Defendant Rezko acknowledged this theory in his original post-trial motion where he asserted that "the government's theory of the scheme to defraud encompassed two aspects – the misuse of Levine's position on the Planning Board to obtain a kickback from Mercy Hospital and the misuse of Levine's position on TRS to obtain kickbacks of finders' fees from the investment firms seeking to do business with TRS and other state investment boards." (R. 616 at 12.) In

other words, the government did not charge or pursue a theory that Rezko was guilty of honest services fraud because of self-dealing or some undisclosed conflict of interest[2] that is no longer a viable theory after *Skilling* and *Black*.  Furthermore, during the hearing on this motion, Defendant conceded that "it's an objective fact that [the government's] primary theory of prosecution here was bribes and kickbacks."  (Transcript from 1/28/11 Oral Argument ("Tr.") at 16.)

Defendant contends, however, that the arguments, the erroneous instruction, and evidence permitted the jury to find that Rezko abused Levine's position for gain other than bribes.

The Court disagrees.  Looking at the charges, evidence, and government arguments, it is clear beyond a reasonable doubt that no reasonable jury could have found Rezko guilty of honest services fraud based on conduct not involving bribery or kickbacks.

## A.    Glencoe Capital – Counts 1, 2, 17, 23-24

Counts 1 and 2 both pertain to a transaction involving TRS's investment with Glencoe Capital.  They are honest services mail fraud counts upon which the jury convicted Defendant. The jury also convicted Defendant on Count 17 – a bribery charge involving this same Glencoe Capital transaction.  The Court previously described the Glencoe Capital transaction as follows:

> Specifically, the evidence at trial established that Shelly Pekin and Stuart Levine met in approximately December 2002 to discuss TRS investing money with Glencoe Capital, a private equity firm in which Pekin was an investor.  TRS was seeking firms with which to invest benefits for teachers.  TRS's Board reviewed all investment proposals for TRS's

---

[2] Defendant also agreed, as Judge Pallmeyer found in the Ryan case, that if the undisclosed conflict at issue involved conversations regarding the kickbacks and bribes, such conduct would fall within honest services fraud as narrowed by *Skilling* and *Black*.  *See Ryan,* ___ F.Supp.2d ___, 2010 WL 5495015.

funds submitted by private investment management companies. Pekin wanted Levine to introduce Glencoe Capital to TRS. Levine agreed to do so and to use his influence and board position with TRS to obtain money for Glencoe Capital from TRS — for a portion of Pekin's finder's fee from Glencoe Capital. Pekin and Levine both testified that they had additional discussions after that initial meeting wherein they discussed Glencoe Capital paying Pekin a finder's fee for the TRS investment, and Levine getting a percentage of that fee. During several subsequent discussions, Levine told Pekin that he would have to split his finder's fee with another individual at Levine's direction.

After meeting with Defendant Rezko in Defendant's office in early 2003, Levine testified that he changed the recipient of the finder's fee at Rezko's direction, although he did not learn the new recipient until after TRS had approved the investment. Levine testified the he was willing to forego his portion of the finder's fee and instead direct the fee as Rezko told him because he "wanted to further ingratiate [himself] with Mr. Rezko, and [he] had already determined that [he] wasn't going to take a part of the fee.... And [he] thought it good business sense." Levine thereafter contacted Mr. Bauman, the Executive Director of the TRS, and asked him to have a meeting with Glencoe Capital and to "make sure they got an investment." Glencoe Capital got the investment.

The evidence showed that in August 2003, the TRS Investment Committee of the Board voted to allocate $50 million to Glencoe Capital to invest. The Board was not aware of Levine's or Rezko's financial interest in the transaction when it approved the transaction, even though Levine was a member of the TRS Board. Furthermore, Mr. Bauman did not disclose Levine's request to make it happen.

Based on the investment, Pekin expected to receive a finder's fee of $375,000 from Glencoe Capital. The evidence showed that Pekin received over $250,000 of his finder's fee from Glencoe Capital through several checks. (Gov. Ex. Glencoe Checks Group.) Specifically, Glencoe Capital issued him the following checks: 1) a check in the amount of $62,500, dated September 12, 2003; 2) A check in the amount of $125,000, dated January 9, 2004; 3) a check in the amount of $93,750, dated March 1, 2004; and 4) a check in the amount of $93,750, dated May 26, 2004. (*Id.*)

At Rezko's direction, Levine testified, and the taped telephone conversations corroborated, that he directed Pekin to pay a portion of his finder's fee to Joe Aramanda, an individual Pekin did not know. Pekin thereafter, at Levine and Rezko's direction, issued two $125,000 checks to Aramanda's company — J.R.A. Investments, LLC — out of the proceeds of the $375,000 from the fraudulent scheme. (Gov. Ex. Aramanda Check 1 & Aramanda Check 2.) At the time Pekin gave Aramanda the March 4, 2004 checks, he had already received over $250,000 from his finder's fee from Glencoe Capital. (Gov. Ex. Glencoe Checks Group.)

*United States v. Rezko*, 2008 WL 4890232, at **3-4 (N.D. Ill. Nov. 12, 2008). The testimony

further revealed that Pekin and Armanda, a long time friend and business associate of Defendant's, entered into a sham consulting agreement to cover up this transaction. Armanda did not have a legitimate consulting agreement, did not do anything to earn the fee, and got his cut of the finder's fee through Defendant Rezko's direction. Armanda, in addition, had paid off a prior debt that Rezko owed to Semir Sirazi. This is a classic bribery/kickback scheme. Indeed, the jury convicted Rezko for attempted bribery in connection with this very transaction. Because "it is not open to reasonable doubt that a reasonable jury would have convicted" Defendant of honest services fraud involving bribery and kickbacks, the convictions on counts 1 and 2 stand. *Black*, 625 F.3d at 388, citing *Hedgpeth v. Pulido*, 555 U.S. 57, 129 S.Ct. 530, 531-32, 172 L.Ed.2d 388 (2008) (per curiam); see *Neder v. United States*, 527 U.S. 1, 15-16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *United States v. L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009).

### B. JER Transaction – Counts 4, 5, 6

The jury convicted Defendant Rezko on Counts 4 through 6 – all honest services fraud charges involving the JER transaction. JER was a Virginia real estate company seeking to have TRS invest in it. TRS ultimately invested $85 million with JER.

Defendant wanted Charles Hannon, whose wife had loaned Defendant a substantial amount of money, to get a finder's fee on the JER investment, even though he played no role in the investment. Rezko told Levine to ensure that Hannon got a portion of the fee. At trial, both Hannon and Joseph Cari testified that Defendant provided Hannon's name for the finder's fee on the JER investment. Levine also testified that Rezko directed him to call Hannon in connection with the JER finder's fee. In addition, Clyde Robinson from JER testified that he had never

heard of Charles Hannon and that he did not play any role in JER's attempts to get an investment from TRS.

Defendant Rezko subsequently told Hannon that he would receive ten percent of one percent of the $80 million investment in JER as a finder's fee. In order to receive the money, Rezko told Hannon that he needed to have an Illinois corporation. Hannon thereafter incorporated Emerald Start International Inc.

Steve Loren drafted a sham contract for Hannon to sign as a "consulting" arrangment. (Gov. Ex. Hannon Fax 1.) At trial, Hannon admitted that he was going to receive approximately $80,000 for doing nothing. Hannon explained that he asked Defendant Rezko if he could get 15% of the fee, rather than 10%. Rezko, who was controlling the money, told him that he could not have any more money. Ultimately, JER refused to sign the consulting agreement with Emerald because Emerald was not providing any consulting services, thus Hannon never received any money.

Similar to the Glencoe Capital transaction, the jury convicted Rezko for attempted bribery in Count 20 in connection with the precise transaction at issue in the honest services fraud convictions on Counts 4 through 6. Based on the classic underlying bribery scheme involved in the JER transaction, because "it is not open to reasonable doubt that a reasonable jury would have convicted" Defendant of honest services fraud involving bribery and kickbacks, the convictions on counts four through six stand. *Black*, 625 F.3d at 388, citing *Hedgpeth v. Pulido*, 555 U.S. 57, 129 S.Ct. 530, 531-32, 172 L.Ed.2d 388 (2008) (per curiam); *see Neder v. United States*, 527 U.S. 1, 15-16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *United States v. L.E. Myers Co.*, 562 F.3d 845, 855 (7th Cir. 2009).

## C.     Sterling Financial – Counts 7 and 8

The jury convicted Defendant Rezko on Counts 7 and 8, honest services fraud charges in connection with the Sterling Financial transaction.  Mike Winter, Defendant's friend and business associate, testified that Defendant Rezko told him during the spring of 2003 to contact Stuart Levine about investing money in TRS because Levine "was an intricate part of the TRS Board" and TRS would be "friendly" to his referrals.  Rezko also explained to Winter that he would receive a fee for referring business to the TRS fund.  The Court previously summarized the evidence presented at trial on the Sterling Financial transaction:

> Winter had contacts with Sterling Venture Financial, including Danny Rosenberg, and wanted to assist Sterling in getting a TRS investment.  Stuart Levine testified that he and Defendant Rezko agreed to assist Sterling in obtaining funds from TRS.  Rezko did not intend to share the finder's fee with Levine for this investment.  As Levine testified, "I was happy to accommodate him in such things, that he did not have to worry about my asking for a part of anything I helped with, that ultimately, I believed Mr. Rezko would involve me in other and larger deals; and ultimately, I would have a chance to make more money by acting in this fashion than in any other."

> Levine testified that Defendant asked him to help Sterling Financial obtain an investment from TRS.  Winter and Levine subsequently met.  Levine thereafter called Jon Bauman, the Executive Director of the TRS, told Bauman that he would be receiving a call from Mr. Winter, and asked Bauman to "set up a meeting with him and put them through the process."  Levine testified that he had previously discussed with Bauman accommodating TRS applications supported by Defendant Rezko.

> Both Danny Rosenberg and Mike Winter testified that Winter would receive a finder's fee of one percent of the amount TRS invested with Sterling.  Winter testified that he discussed splitting his finder's fee for a Sterling investment with Defendant.  Furthermore, Winter testified that Rezko told him that "he thought maybe he should be entitled to a little bit larger percentage based on the fact that he had to include other people in his portion."

> Rosenberg sent Winter a draft consulting agreement on approximately May 5, 2004.  Rosenberg testified that Winter was the finder and would receive the finder's fee.  (Gov. Ex. Sterling Questionnaire Draft 1; Gov. Ex. Sterling Questionnaire Draft 2.)  Shortly after Winter received the draft, he met with Defendant Rezko and Chris Kelly.  Winter testified that co-schemer Chris Kelly told him that Winter could not be named as the

finder on the Sterling investment because "it would not look good for my name to be disclosed, based on the fact that I officed in Rezmar's offices and shared offices with Mr. Rezko and based on Mr. Rezko's relationship with the Governor." Winter agreed and inserted Myron Cherry's (his personal attorney) name instead, even though Mr. Cherry had not done any work on the Sterling investment. Rosenberg confirmed that Winter told him to include "Myron Cherry & Associates" as the name of the finder. (Gov. Ex. Sterling Questionnaire Final.)

Winter told Defendant that Sterling was not moving fast enough through TRS. Defendant then went to Stuart Levine and told him that Sterling needed to get through. Levine called Jon Bauman. (Gov. Ex. Call 98, 4/30/2004.) Bauman told Levine him that if they submit their application materials, he would make sure that Sterling was placed on TRS's agenda.

Scott Parish, a former private equity investment officer with TRS, told Rosenberg that Sterling would be on the May 2004 agenda at TRS. Parish came for on-site visit on May 18, 2004.

*Rezko*, 2008 WL 4890232, at 11-12.

The FBI approached Levine about his fraudulent activities on the evening of May 20, 2004. The next day, Levine told Bauman that he should do what he thought was best with respect to Sterling. On May 21, 2004, Scott Parish called Rosenberg and informed him that Sterling would not, after all, be on TRS's May 2004 agenda.

In sum, the evidence established a core bribery case underlying the honest services fraud. Rezko and Levine used Levine's position on the TRS Board to attempt to get the Sterling Financial transaction approved by the TRS Board so Rezko could get a chunk of the finder's fee. It was a direct *quid pro quo*. The government did not argue otherwise nor was there evidence of an undisclosed conflict. Based on this evidence, no reasonable jury could have found Rezko guilty of honest services without finding an underlying bribery scheme.

Finally, Defendant argues that the government did not charge a corresponding bribery count for the Sterling Financial transaction or the Mercy Hospital transaction. Although

accurate, the lack of such a charge alone is not determinative.  *See Black*, 625 F.3d 386 (7th Cir.

2010) (no corresponding bribery charge yet count of conviction upheld); *Ryan v. United States*,

__ F. Supp.2d __, 2010 WL 5495015 (N.D. Ill. Dec. 21, 2010) (same).  As Defendant

acknowledged, the bribery convictions on the Glencoe Capital and JER counts make his

"argument much more difficult" on those counts.  (Tr. at 17.)  It does not, however, preclude a

harmless error finding on those honest services fraud counts that do not have corresponding

bribery counts of conviction.

### D.      Mercy – Counts 11 and 12

The jury also convicted Rezko on Counts 11 and 12 of honest services fraud in

furtherance of the scheme relating to the Mercy Hospital Certificate of Need ("CON")

application.  The Planning Board reviewed CON applications submitted by hospitals and other

medical facilities that wanted to build new facilities in Illinois.  The State of Illinois required an

approved CON before a hospital or other medical facility could begin construction on a new

facility.

#### 1.      The Charges and Arguments

The Superseding Indictment charged a pure kickback scheme in connection with these

transactions, the government argued these counts as a kickback scheme, and the evidence

supported a kickback and bribe scheme.  No reasonable jury could have found Defendant guilty

on these counts without finding that he engaged in a kickback scheme.  Specifically, the

Superseding Indictment charges the following in connection with the Mercy Hospital scheme:

#### REZKO, LEVINE, and Kiferbaum: Mercy Hospital Kickback

12. It was further part of the scheme that REZKO and LEVINE agreed that they would
use their influence and LEVINE's position at the Planning Board to assist Mercy Hospital in

receiving approval of its application to build a hospital in Crystal Lake, in exchange for a kickback from Kiferbaum. REZKO and LEVINE agreed that they would share approximately $1 million or more from Kiferbaum in exchange for their assistance. In connection with this aspect of the scheme:

a. In or about late 2003, LEVINE and Kiferbaum agreed that LEVINE would use his position as a Planning Board member to attempt to influence the Planning Board to approve Mercy's application to build a hospital in Crystal Lake so that Kiferbaum Construction Company could build the planned hospital. In exchange for LEVINE's help, LEVINE and Kiferbaum agreed that Kiferbaum would pay a kickback as directed by LEVINE, with the exact amount and manner of the payments to be determined at a later date.

b. LEVINE told Rezko about Kiferbaum's willingness to pay a kickback to ensure that Mercy Hospital's application for a CON would be approved. REZKO agreed to support Mercy Hospital's application in exchange for a share of Kiferbaum's kickback. REZKO and LEVINE agreed that they would split evenly Kiferbaum's kickback, which they expected would be approximately $1 million or more.

c. At its December 2003 meeting, the Planning Board issued an intent-to-deny with respect to Mercy Hospital's application.

d. On or about April 21, 2004, the Planning Board voted in favor of granting Mercy Hospital's application for a permit to build a new hospital. REZKO and LEVINE took steps to cause other Planning Board members to vote to approve Mercy Hospital's application, and LEVINE voted in favor of the application.

e. After the April 21, 2004 Planning Board meeting, LEVINE directed Kiferbaum to pay the kickback proceeds relating to the Mercy Hospital project to Weinstein. Levine, Kiferbaum, and Weinstein agreed to use a sham consulting contract to conceal the fraudulent nature of the intended payments from Kiferbaum to Weinstein.

(R. 546, Superseding Indictment, at 24-25.) Consistent with the Superseding Indictment, the

government argued Counts 11 and 12 only as involving a bribery and kickback scheme. From

the inception of the case during opening statements, the government made clear that the Mercy

Hospital charge was premised on a bribe scheme:

You're going to learn that the reason why is because defendant Rezko had made a deal with Stuart Levine. They had agreed to split a bribe in exchange for -- sorry -- securing this vote.

> The plan had actually started months before the vote. A builder named Jacob Kiferbaum wanted to build Mercy's new hospital. And he had twice before paid Stuart Levine bribes to get projects done. And, so, Jacob Kiferbaum and Stuart Levine made an agreement. They agreed that he would pay Stuart Levine a bribe in exchange for Stuart Levine getting Mercy its approval to build a new hospital.

(Opening Argument at 10.)

When describing Count 11 during closing arguments, the prosecutor told the jury:

> Count 11 is a mailing of a letter on November 25, 2003, from Jacob Kiferbaum to Mercy, soliciting the construction contract. Obviously, the prerequisite to be able to pay the bribe to Levine, to split with Tony Rezko, to get the contract to build a hospital.

Similarly, the government argued Count 12 as a bribery and kickback scheme:

> Count 12, this is a later one. This is May 24th, 2004. This is a mailing of a letter from the Planning Board to Mercy confirming they got their CON. Obviously, getting the CON was the key to the bribe.

Further, the government told the jury that the Mercy Hospital charge was "a crime that involves deciding where hospitals are going to be built and people are going to get their healthcare based on who is willing to pay a bribe. This is a crime about what billions of dollars of TRS money is going to be done with because millions of dollars is going to be put in the pocket of the people who have political power." (Rebuttal argument at 50).

Even Defendant Rezko characterized the Mercy scheme as a kickback scheme throughout his original motion for a new trial after the jury returned its guilty verdict. (*See e.g.*, R. 616 at 12 ("the government's theory of the scheme to defraud encompassed ... the misuse of Levine's position on the Planning Board to obtain a kickback from Mercy Hospital"); at 15 (challenging Levine's credibility "in connection with the Planning Board and Mercy Hospital kickback"); at 15 (noting Levine's testimony that "he and Rezko agreed that Levine would seek a $1 million dollar kickback from Jacob Kiferbaum in return for arranging Mercy Hospital's CON application

to be approved by the Planning Board"); at 16 (noting Levine's testimony that Rezko "fixed the amount of the Mercy kickback"); at 18 (referring to the "Mercy kickback")).

## 2.    The Evidence

At trial, the evidence showed that Rezko controlled five of the nine members on the Planning Board — Thomas Beck, Dr. Imad Almanaseer, Stuart Levine, Dr. Fortunee Massuda, and Dr. Michelle Malek.  (*See, e.g.*, Gov. Ex. Planning Board Sheet).  After Joseph Kiferbaum of Kiferbaum Construction approached Levine – to whom he had previously paid bribes in exchange for business – about obtaining a CON for Mercy Hospital to build a new hospital in Crystal Lake, Illinois so Kiferbaum Construction could build it, Levine talked to Rezko.  Levine testified that Rezko agreed to help get the CON application approved in exchange, in part, for a portion of the bribe money Kiferbaum agreed to pay.  The evidence further showed that Levine and Rezko met at the Standard Club on April 14, 2004, and discussed the Mercy CON application with Rezko.  He testified that they discussed splitting the bribe money from Kiferbaum 50/50 if the CON passed.  Rezko agreed to speak to Thomas Beck, the Chairman of the Planning Baord, and get the application passed.

As the Court previously described the evidence:

After April 14, 2004 and prior to the April 21, 2004 Planning Board meeting, Beck testified that he spoke with Rezko about the Mercy Hospital application for a CON, as well as the other agenda items.  During this conversation, Rezko told Beck that he now favored approval of the Mercy CON application even though Beck informed Rezko that he did not think the application was good enough to be approved.   Beck thereafter spoke with Levine.  That call was captured on the wire tap.  (Gov. Ex. Call 257, 4/19/2004.)  During that call, Beck told Levine: "I've got the marching orders" and "there's one I think you may be able to help us ....  Mercy Hospital....  Our boy wants to help him."  (*Id.* at 4.)  As Beck testified, he informed Levine that Rezko wanted to get Mercy Hospital approved.  (*See also* Gov. Ex. Call 277, 4/19/2004 at 3.)

Beck testified that he told Levine right before the April 21, 2004 meeting that he could

not go along with Mercy because it was not a good application, and Levine got Rezko on the phone. Rezko then told Beck to "do what he had to do" to get the application approved. The phone records corroborate the placement of these calls.

Dr. Almanaseer testified that Beck approached him before the April 21, 2004 meeting commenced, and told him that Rezko wanted the Mercy Hospital CON approved. When Dr. Almanaseer inquired about the change in Rezko's position, Beck told him that "that's how Tony wants it."

*Rezko*, 2010 WL 4890232, at *14.

The Planning Board meeting took place on April 21, 2004. Because the five members controlled by Rezko ultimately voted "yes" on the application despite one of them changing his vote from "pass" to "yes," the application passed. As Ms. Murphy, the General Counsel to the Planning Board, testified, when the Mercy CON passed the Board's approval "there was an audible collective shared gasp heard throughout the room." Indeed, she testified that the "procedure had been highly irregular."

Based on the charge, the evidence, and the arguments at trial, Counts 11 and 12 represent core kickback honest services crimes. Given the record, "it is not open to reasonable doubt that a reasonable jury would have convicted" Defendant Rezko of honest services fraud for the Mercy Hospital counts based on a classic kickback scheme. *Black*, 625 F.3d at 388. Defendant's motion is therefore denied as to these counts.

### 3. Defendant's contentions fail

Defendant attempts to refute this conclusion by citing two statements in the government's approximate 4 ½ hour closing argument to support his assertion that the government did not only argue that the charged scheme involved bribery and kickbacks. Namely, Defendant argues that the following statements in the government's closing argument demonstrate that the government asked the jury to convict Rezko on honest services without a bribery or kickback element:

And it is illegal – an it is a crime – for Stuart Levine and others to agree that Stuart Levine will make decisions based on anything other than what's in the best interests of the people of Illinois.

Did the defendant join this corrupt scheme? Did he agree with Levine and others that Levine would violate his duty of honest services; that there would be decisions made based on anything other than what was in the best interests of the people of Illinois? That's the crime.

(Tr. 5/12/08, p. 155.)

Defendant, however, has taken these sentences out of context. The government did not make these statements in isolation. In his role on the TRS and Planning Boards, Levine did have a duty to make decisions based on the best interests of the people of Illinois. The government did not argue, however, that the jury should convict Rezko solely on a breach of Levine's duty. Instead, it consistently argued that Rezko participated in this scheme to misuse Levine's office in order to obtain kickbacks and bribes.

Defendant further contends that "there was much evidence in this case that Rezko sought favors for friends, political accommodations, and campaign contributions and that he had ex parte communications with Levine in an effort to achieve those ends." Defendant, however, fails to identify any such evidence. Indeed, the government did not introduce any evidence that Levine's actions were taken as favors or political accommodations or that they simply involved ex parte conversations. Furthermore, the government never argued such a theory to the jury. In sum, the conduct at issue "was clearly a kickback scheme." *United States v. Cantrell*, 617 F.3d 919, 921 (7th Cir. 2010).

### E.  Counts 13-15

The jury also convicted Defendant of Counts 13, 14 and 15 – honest services fraud convictions based on intercepted telephone calls between Levine and Robert Weinstein[3] that were made in furtherance of the scheme to defraud.  Weinstein was a co-schemer of Defendant's and Weinstein's.

#### 1.  April 17, 2004 Call

Count 13 charged Rezko with honest services fraud in connection with an April 17, 2004, call between Levine and Weinstein.  The call took place just three days after Rezko's April 14, 2004 meeting with Levine at the Standard Club.  The meeting was a significant event during the course of the scheme.  During that significant meeting, Levine meet Rezko in a private room at the Standard Club and they discussed the scheme to defraud.  The wire taps confirm the meeting.  (Gov. Ex. Call 12, 4/12/2004, at 2; *see also* Gov. Ex. Standard Club 2; Gov. Ex. Standard Club Group.)  Levine testified that during the meeting he informed Rezko of the potential finder's fees from entities seeking TRS investments, and told Rezko that "there was an opportunity for a lot of money to be made."  Levine proposed sharing the finder's fees with Rezko, in exchange for Rezko using his influence with the administration and the various State Boards.  Levine explained to Rezko the specifics of some of the investments, including the potential amount of finder's fees available, and that Dr. Robert Weinstein would share in the fees.  Rezko, Levine testified, agreed to the arrangement.

---

[3] On March 10, 2009, Weinstein pled guilty to a superseding information in a separate case.  (09 CR 515, R. 39.)

During the April 17 call, Levine and Rezko discussed various aspects of the scheme to defraud and Levine confirmed that "Tony's fine with all of it...." (4/17/04 transcript at 1.)  They then discuss the Glencoe Capital deal where Pekin expected to receive a finder's fee of $375,000 as discussed above.  Although they discussed other transactions, including some where the jury acquitted Rezko on the underlying charges, based on the jury's conviction on the Glencoe Capital charges – including the bribery charge – it is clear beyond a reasonable doubt that a jury would have convicted Defendant Rezko of honest services fraud involving a bribe or kickback absent the instructional error on Count 13.

### 2.  April 21, 2004 Call

Count 14 pertains to an April 21, 2004 call between Levine and Weinstein regarding, in part, the Mercy Hospital transaction.  The call took place after the Planning Board meeting discussed above where the Planning Board approved the Mercy CON.  During the call, Levine bragged to Weinstein about what had happened during the Planning Board meeting.  Levine told him that the application passed because "Tony and I both decided you know I like to get things done." (4/21/04 Trans. at 2.)  He further told Weinstein when explaining how the Mercy CON passed, that "They know Tony's givin' the orders." (*Id.*)  When referring to Beck, Levine told Weinstein that "Tony had him do it, see what Tony, Tony, uh had made commitments on all this." (*Id.*)  He added, "of course none of 'em know that it's uh, Tony and me," (*id.*), referring to the "illegal bribe" Kiferbaum promised to Levine and in which Rezko would share.  (Tr. Levine Testimony at 319.)  Levine also described how the voting took place, including that he had to talk to Almanaseer to change his vote.  (4/21/04 Tr. at 2-3.)

During the call, Levine told Weinstein that "Tony handled this absolutely right, too." Levine testified that he "was referring there to the fact that no one outside of Mr. Kelly and Mr. Rezko and myself, as far as I know -- that we were the only three that knew that it was because of hiring Kiferbaum, and the bribe that Kiferbaum was going to pay me and I was going to share, that we wanted Mercy to be done." (Tr. Levine's testimony 3/20/08, at 327-28.) Levine also explained at trial that Weinstein expected to share in the bribe. (Tr. Levine's testimony 3/21/08 at 367-68.) In fact, Kiferbaum expected to pay the bribe money to Weinstein or his company, and Weinstein would then divide it. (*Id.* at 368.)

As discussed above, the Mercy Hospital transaction was a core honest services fraud with an underlying kickback. As such, no reasonable jury would have convicted Defendant of Count 14 without finding that he engaged in a scheme involving kickbacks.

### 3.    May 1, 2004 Call

Count 15 is an honest services fraud charge based on a May 1, 2004 call between Levine and Weinstein in furtherance of the scheme. During the interstate call, Levine and Weinstein discuss a variety of topics, including the JER transaction discussed above and the Mercy Hospital kickback scheme. Specifically, Levine tells Weinstein that "there's a commingled fund that is closing in, in May that there's a $750,000 fee that's going to one of Tony's guys and then, uh, uh, and then half of it to a contract with you." (5/1/04 11:09 am call at 19; Tr. Levine Testimony 4/2/11 at 1000.) Levine explained that he was referring to JER. As described in detail above, Defendant selected Charles Hannon to obtain a portion of the finder's fee as part of the fraudulent scheme. During the call with co-schemer Weinstein, they discussed Hannon paying part of the fee to a company controlled by Weinstein.

Given their explicit discussion of both the JER and Mercy Hospital transactions in furtherance of the scheme to defraud, for the reasons discussed above, Defendant's arguments fail. In addition, the jury found Defendant guilty of aiding and abetting bribery in connection with the JER transaction. It is clear beyond a reasonable doubt that a jury would have convicted Defendant Rezko of honest services fraud involving a bribe or kickback absent the instructional error on Count 15.

## IV.   Rezko is Not Entitled to a New Trial on the Two Bribery Counts

Defendant next argues that he is entitled to a new trial on Counts 17 and 20 – the two counts of bribery on which the jury convicted him. He argues that the honest services instructions "poison[ed] the jury's consideration of the other counts." In *Black*, the Seventh Circuit rejected the defendant's prejudicial spillover argument as to his obstruction of justice conviction. The court noted that "[i]f a count is submitted to the jury under an instruction apt to poison the jury's consideration of other counts as well, the defendant may be entitled to a new trial," yet concluded that no "reasonable jury could have acquitted Black of obstruction if only it had not been instructed on honest-services fraud." *United States v. Black*, 625 F.3d 386, 390 (7th Cir. 2010). In rejecting the defendant's argument, the Seventh Circuit noted that the evidence of the obstruction of justice conviction was "very strong" and that the evidence of the honest services fraud was "a subset of the evidence of pecuniary fraud." *Id.*

Rezko argues that the bribery charges in Counts 17 and 20 were based on discrete transactions thus "much of the evidence that was admitted to prove the scheme and to prove various acts in furtherance of the scheme would not have been admitted." (R. 694 at 8.) In support of this argument, Rezko only identifies the evidence relating to Mercy Hospital and the

Sterling Financial transactions. He asserts that evidence pertaining to these two transactions would not have been admitted and that such evidence was prejudicial. For the reasons discussed in detail above, however, Rezko's convictions on the Mercy Hospital and Sterling Financial schemes survive the harmless error analysis because they are classic honest services fraud convictions with bribery underlying them. As such, all of the evidence was admissible.

In addition, the evidence on both of the bribery counts was overwhelming. *See Black*, 625 F.3d at 390 (noting that evidence of obstruction of justice conviction was "very strong" and rejecting defendant's argument that the erroneous honest services instruction contaminated his obstruction conviction). This evidence is discussed above. The government introduced extensive tape recordings which corroborated the testimony of its witnesses and set forth the bribery schemes.

Finally, Defendant's argument that the evidence on the Mercy Hospital and Sterling Financial transactions "poison[ed] the jury's consideration of the other counts" is belied by the jury's verdict in this case. Such evidence was admitted at trial, yet the jury acquitted Defendant Rezko on eight separate counts, including three counts of honest services fraud, four counts of attempted bribery, and one count of attempted extortion.

## CONCLUSION

For the reasons discussed above, Defendant's Post-Trial Motion for A New Trial is denied.

Dated: March 3, 2011                    ENTERED:

                                        AMY J. ST. EVE
                                        United States District Court Judge

31