UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 05 CR 691-4 |
| vs. | ) | Judge Amy J. St. Eve |
| | ) | |
| ANTOIN REZKO | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by and through PATRICK J.

FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully

submits its Sentencing Memorandum with respect to defendant Antoin Rezko, stating as

follows:

**I.      INTRODUCTION**

In 2008, defendant Antoin Rezko was found guilty by a jury of 16 counts of fraud,

bribery, and money laundering in connection with his corrupt activities at the Illinois

Health Facilities Planning Board and the Illinois Teachers' Retirement System.  Since

then, it has become clear that those crimes were simply the tip of the iceberg of Rezko's

efforts to defraud the State of Illinois.  In fact, Rezko plotted with the most powerful

people in Illinois state government, namely, Rod Blagojevich, Chris Kelly, and Lon

Monk, to use their tremendous power over the State of Illinois to line their pockets with

millions of dollars from a variety of corrupt schemes that Rezko devised and

implemented.  Of course, Rezko's crimes were not limited to defrauding the people of

Illinois.  He also pleaded guilty in October 2010 before Judge Zagel to his role in a multi-

1

million dollar loan fraud scheme that victimized the General Electric Capital Corporation.

It is now time to sentence Rezko for the entirety of his proven criminal behavior in both the instant case and the separate case before Judge Zagel (06 CR 729). Recognizing there is overlap between the crimes charged in the two cases, the government will make the same sentencing recommendation to each sentencing judge: Rezko should receive a total sentence of between 11 years (132 months) and 15 years (180 months) imprisonment. In fact, the government will ask this Court to impose a sentence of 11-15 years, as Rezko's conduct in the instant case by itself is worthy of such a sentence.[1] The government's recommendation takes into account Rezko's extensive history of corruption, including the crimes discovered after his trial, ensures that Rezko's sentence will be fair relative to other defendants in this case, and takes into consideration his efforts to cooperate with the government and other mitigating factors.

## II. BACKGROUND OF REZKO'S CORRUPT ACTIVITIES WITH THE BLAGOJEVICH ADMINISTRATION

At Rezko's trial, the government proved his involvement in an expansive fraud scheme to obtain kickbacks and bribes from entities seeking favorable treatment from the Illinois Teacher's Retirement System ("TRS") and the Health Facilities Planning Board ("Planning Board"). Rezko worked with Stuart Levine beginning in about the summer of 2003 to receive the kickbacks from entities and individuals who wanted TRS investments

---

[1] The government expects that this Court will sentence Rezko first. The government will adjust its recommendation before Judge Zagel to take into account whatever sentence is imposed by this Court with the goal of reaching a total sentence of between 11 and 15 years.

or Planning Board Certificates of Need. Rezko played an important role in this fraud – he ensured that Levine would remain as a TRS trustee and member of the Planning Board, arranged for allies to be appointed to the TRS Board when Levine needed them, and picked bagmen who would receive the finder's fees. Rezko directed where $250,000 in kickbacks would go, and schemed with Levine to obtain millions more.

Rezko's schemes with Levine, however, were just one piece of a broader and more serious fraud that Rezko perpetrated against the State of Illinois. Rezko conspired with Rod Blagojevich, Lon Monk, and Chris Kelly to use their power over the State of Illinois in an attempt to illicitly make millions of dollars for the four men to share. As part of that criminal plan, Rezko was charged with identifying and developing different ways in which Rezko, Blagojevich, Kelly, and Monk could exercise their state power to line their own pockets and to obtain campaign contributions for Blagojevich. Rezko's scheming with Levine about TRS and the Planning Board became just one of the ways in which Rezko sought to achieve that criminal end.

Much of the evidence of Rezko's participation in this broader criminal effort to obtain kickbacks and bribes with Blagojevich, Monk, and Kelly was discovered by the government only after Rezko's trial. In particular, Monk, who was Blagojevich's Chief of Staff from 2003-2005 and an integral player in the conspiracy, began cooperating with the government beginning in about January 2009. The evidence described below was brought out during the trials of Rod Blagojevich. Importantly, the government does not believe that Rezko will contest the accuracy of any of the evidence described in this

3

section.  Accordingly, the Court should rely upon this evidence in calculating Rezko's

sentencing guidelines and determining his sentence under the factors set forth in 18

U.S.C. § 3553.[2]

### A.  Rezko's Influence and Role in the Blagojevich Administration

Rod Blagojevich was first elected Governor of the State of Illinois in November

2002.  Rezko and Kelly played important roles in assisting Blagojevich in this campaign.

Rezko was one of the top fundraisers for Blagojevich.  Kelly oversaw most aspects of

fundraising for the campaign, including ensuring that other individuals met their

fundraising goals.

After Blagojevich became Governor in January 2003, Rezko and Kelly continued

to play important roles in fundraising for Blagojevich.  In 2003 and 2004, Rezko and

Kelly had the primary role in overseeing the continuing efforts to raise money for

Blagojevich.  They were heavily involved in organizing the large annual fundraising

events that Blagojevich held in the summers of 2003 and 2004.

Rezko also had significant influence over aspects of state government during the

transition period after Blagojevich won office, and that influence continued after

Blagojevich took office.  According to Monk, Rezko was part of the informal kitchen

---

[2]  To the extent there is a dispute about the evidence in this section, the government is willing to provide the Court with reports of interview of Monk and other relevant witnesses, the trial testimony of Monk and others, and, if necessary, the live testimony of Monk and others.  In addition, to the extent Rezko disputes any of the evidence in this section, the government may request the Court determine whether Rezko has breached his proffer agreement with the government and, thereafter, provide the Court with the relevant reports of Rezko interviews.

cabinet that Blagojevich used to make decisions, and had complete access to Blagojevich and/or Monk to talk about any state issue he wished. Rezko recommended and/or interviewed many of the people who were selected for top positions in Blagojevich's administration and was actively involved in the awarding of certain state contracts.

Rezko also exercised significant influence over the appointments Blagojevich made to state boards and commissions. Although Monk was the primary person responsible for overseeing the selection process for filling boards and commissions vacancies, Rezko recommended many candidates for various boards and commissions, and Monk gave Rezko's recommendations great weight. When Rezko made his recommendations for board appointments, Monk understood that Rezko was often rewarding people who had made, or would make, contributions to Blagojevich. With Monk present, Rezko explained to Blagojevich in May or June 2003 his view that people should make $25,000 contributions to Blagojevich if they wanted to be appointed to certain prestigious or high-paying boards.[3]

According to Monk, Rezko was particularly interested in the state boards that controlled money, including TRS and the other state pension boards like the Illinois State Board of Investment ("ISBI") and the State University Retirement System ("SURS") as well as the Planning Board. Blagojevich gave Rezko great latitude in making those picks.

---

[3] In the Fall of 2003, Fortune Massuda and Michel Malek each made a $25,000 contribution to Friends of Blagojevich (at Rezko's request) within weeks of their appointment to the Planning Board.

Monk also indicated that Rezko specifically recommended that Levine be appointed to the Planning Board and be re-appointed to the TRS Board. Monk understood that Rezko wanted to appoint people whom Rezko could then influence.

### B. Rezko's Attempts to Obtain Money and Campaign Contributions Through State Action With Blagojevich, Kelly, and Monk

Rezko, Blagojevich, Kelly, and Monk had conversations, individually and collectively, about how the four of them could personally profit from their control over the state government. In those criminal conversations, Blagojevich, Rezko, Kelly, and Monk discussed a number of specific ideas for illegally making money, such as operating businesses that would get state money in different ways and receiving fees from people who did business with the state. Rezko, Blagojevich, Kelly, and Monk did not expect to have to invest significant money in any of these deals; instead, they were simply looking to collect money from the deals in the form of finder's fees or revenue generated from the deals. As a general matter, within the criminal scheme, Rezko was the one who tried to set up the money-making arrangements and, together with Kelly, was the most knowledgeable about how the plans would work. Blagojevich's and Monk's roles in the criminal scheme were to use their power and authority in state government as needed to assist whatever plans Rezko and Kelly put in place.

The criminal scheme to make money from state action actually began before Blagojevich won the election in 2002. Kelly first brought up the idea to Monk in 2002, when it seemed likely that Blagojevich would win. According to Monk, Kelly suggested

that he, Monk, Blagojevich, and others could benefit financially if Blagojevich won the election, by stating there was money to be made from Blagojevich being Governor and that the Republicans had been doing the same for a long time.

There were occasions after Blagojevich became Governor where Blagojevich, Kelly, Monk, and Rezko all met to discuss their scheme to make money from state action. For example, the four conspirators met in a conference room at Rezmar (Rezko's real estate company) in about mid to late 2003. During the meeting, Rezko led the discussion, standing at an easel or chalkboard, and listed at least three or four different ideas or plans to make money he was developing, which involved some kind of improper exercise of state action. At times during the meeting, Kelly got up and clarified or added to things that Rezko was saying. As Rezko talked, he indicated how much money Blagojevich, Kelly, Rezko, and Monk might be able to personally obtain from the different plans. The amounts that were associated with the different criminal ideas were typically in the hundreds of thousands of dollars per deal, which would be evenly split four ways.

The four men had a similar meeting in about January 2004 at the Beverly Wilshire Hotel in Los Angeles. Again, Rezko was the person who led the discussion and provided further information about the status of the various money-making schemes.

Rezko, Blagojevich, Kelly, and Monk stopped talking about the ideas for using their influence over State actions to make money for themselves only after they learned that Levine had been confronted by the FBI in the spring of 2004.

### 1. Rezko's Involvement in the 2003 Pension Obligation Bond Kickback

One of the ways in which Rezko, Blagojevich, Kelly, and Monk tried to criminally obtain money from their control over the State of Illinois was related to the State's refinancing of $10 billion in Pension Obligation Bonds ("POB") in 2003. This was one of the criminal money-making ideas that was discussed in meetings involving all four men and implemented by Rezko.

Blagojevich, as governor, had the sole power to decide which bond firms would have roles in the POB offering. Illinois state administrators determined that there were a number of investment firms, including Bear Stearns, that were qualified to handle the largest share of the bond sales. Initially, state administrators planned to sell the POB bonds in three different waves, depending on the market conditions; that is, not all $10 billion in bonds would be sold on the same day. Rezko and Kelly advocated to Monk that Bear Stearns should be chosen as the firm that would take the lead on the first round of bond sales, which would mean that Bear Stearns would make the more money on the first round of sales than any other firm. Monk initially understood that Rezko and Kelly were pushing Bear Stearns because either Bear Stearns would make a political contribution to Blagojevich or because Blagojevich, Kelly, Rezko, and Monk would personally make money if Bear Stearns were chosen as the lead. After Monk told Blagojevich that Rezko and Kelly wanted Bear Stearns to be the lead for the first round, Blagojevich decided that Bear Stearns would receive the lead role.

8

Monk also talked with Rezko and Kelly about other businesses that were looking to participate in the $10 billion POB deal. In addition to Bear Stearns, Rezko and Kelly also pushed in favor of other firms, including law firms, to have roles in the POB deal. Monk understood that Kelly and Rezko were looking to reward investment firms and law firms that had contributed to Blagojevich or might be willing to contribute.

On the day of the sale, state administrators suggested that the market conditions were so good that the State could issue all $10 billion in bonds that day (as opposed to the previous plan to sell the bonds on multiple days). Blagojevich, Kelly, and Monk met with several other state administrators to decide whether Blagojevich should authorize the sale of all the bonds that day. Monk understood that it would be financially beneficial for Bear Stearns if the State issued all $10 billion in bonds that day because of Bear Stearns's role as the lead underwriter for the first round. At one point during this meeting, Kelly pulled Blagojevich into a separate room and spoke with Blagojevich privately. Shortly after Blagojevich and Kelly returned, Blagojevich made the decision to issue all $10 billion of the bonds at once. Later that day, Kelly told Monk that, when they were alone, Kelly had told Blagojevich that letting Bear Stearns sell all $10 billion of the bonds at once would mean that Bear Stearns would make more money, and that there would be a greater personal benefit for the four of them, which Monk understood meant that Blagojevich, Kelly, Rezko, and Monk would make money if Blagojevich allowed the entire sale to go forward that day.

After the bonds were issued, Rezko, Kelly, and Monk had further discussions

9

about the criminal proceeds they would make as a result of the POB deal. Rezko told Monk that Robert Kjellander, an associate of Rezko's, was putting money in a separate account that would later be turned over to Rezko. Rezko indicated to Monk that Kjellander either had received or was going to receive money from Bear Stearns for acting as a consultant in relation to the POB deal. Rezko and/or Kelly told Monk that Kjellander was going to give Rezko $500,000, which Monk understood was for the help that Rezko had provided to Bear Stearns and Kjellander relating to the POB deal, and that the four men would each obtain a portion of the $500,000.

Financial records indicate that on or about September 24, 2003, Kjellander received approximately $809,000 from Bear Stearns as a finder's fee in connection with the POB offering. On October 2, 2003, Kjellander transferred $600,000 of that money to Joseph Aramanda. Rezko had arranged for Kjellander to transfer the funds ostensibly as a loan to Aramanda. Kjellander did not do any due diligence on the loan or seek any collateral from Aramanda, even though Aramanda had not been able to obtain a loan from any bank because of his poor financial condition.

After Aramanda received the $600,000 from Kjellander, Rezko directed Aramanda to transfer $450,000 of that money to five individuals who either were owed money by Rezko or had agreed to transfer the money back to Rezko.[4] Thus, Rezko received the

---

[4] Aramanda was willing to transfer the $450,000 at Rezko's direction in part because Aramanda owed Rezko about $500,000 from a prior business deal. As a result, Aramanda felt obligated to follow Rezko's instructions with respect to the money. In 2003, Aramanda did not have the money to repay his debt to Rezko, which Rezko knew because Aramanda had gone to

(continued...)

benefit of the entire $450,000 (which he never repaid to Aramanda).

Aramanda ultimately paid Kjellander back in June 2004, shortly after Rezko arranged for Aramanda to receive another loan of approximately $600,000 from Jay Wilton, another associate of Rezko's, who did business with the State of Illinois. Rezko arranged for Kjellander to be paid back only after Chris Kelly expressed concerns that Kjellander's transfer could be discovered by law enforcement.[5]

## 2. Rezko's Plan To Acquire Interest In Insurance Business

Another criminal money-making plan that Rezko discussed in his meetings with Blagojevich, Kelly, and Monk involved Rezko's efforts to acquire a secret share of an insurance company that would make money by doing business with the State of Illinois. Monk understood that Blagojevich, Monk, and Rezko would use their influence over the state to ensure that the insurance company could do business with the state, and that Rezko in turn would arrange that a share of the insurance company's profits would be split among the four men. In particular, Rezko anticipated that he could improperly arrange for the insurance company to get state business in part because Rezko had

---

[4](...continued)
Rezko for help obtaining funds for his failing restaurant business.

[5] In about 2004, Kelly told Monk that Kelly was "pissed off" at Rezko because Rezko needed $100,000 and took it from the Kjellander account (meaning the kickback that Kjellander was to pay relating to the POB deal). Kelly indicated that he was upset because he thought Rezko's withdrawal of the money would somehow alert the authorities to the existence of the account, so Kelly said he told Rezko to put the money back. Kelly mentioned on more than one occasion to Monk that he was upset with Rezko over this matter. Kelly subsequently indicated to Monk that Rezko put the money back in the account.

recommended the appointments of the people who headed the state's Central Management Services (which, among other things, obtained insurance for the state) and Department of Insurance.

Monk understood from conversations with Rezko in 2003 and 2004 that Rezko was working with an associate of his named Vince DiBenedetto to obtain some kind of interest in an insurance company owned by Michael Segal, but that Rezko's interest in the company would be hidden because the company would be doing business with the state. Corporate records show that an entity controlled by DiBenedetto purchased insurance companies located in California and Nevada from Segal in late 2003, and created an Illinois insurance brokerage company on June 11, 2004.

Monk did not know whether Rezko actually acquired the interest in the insurance company, and stopped talking with Rezko about the insurance company after they learned that Levine had been confronted by the FBI (which took place on May 20, 2004).

### 3. Rezko's Involvement In TRS Kickbacks and Extortions

Rezko planned to use his corrupt relationship with Levine at TRS as a way to make money to be shared with Blagojevich, Kelly, and Monk. Rezko had used his influence over TRS in an effort to obtain campaign contributions even before he started scheming with Levine directly, but expanded his efforts with respect to TRS after his April 14, 2004 Standard Club meeting with Levine. In particular, Rezko recruited Aramanda to act as a conduit for the kickback payments that Rezko would then share with Blagojevich, Kelly, and Monk.

12

a.    The Consolidation of the Pension Boards

At Rezko's trial, Levine testified about an arrangement he understood that Rezko and Kelly made with William Cellini in the spring of 2003, in which Rezko and Kelly agreed that they would oppose a plan to consolidate the various state pension systems (including TRS) if Cellini and Levine used their influence at TRS to help firms chosen by Rezko and Kelly.  Levine understood that Rezko and Kelly would seek to help investment firms that had or would make political contributions to Blagojevich.  Cellini told Levine that Rezko and Kelly agreed to this arrangement.

According to Monk, Rezko and Kelly did, in fact, argue against the idea of consolidating the pension boards to Monk and Blagojevich.  In a meeting with Monk and Blagojevich, Kelly said that consolidation was a bad idea for several reasons.  Kelly said that it would cut back on Blagojevich's ability to appoint people because there would be fewer positions to fill, which Monk understood to mean that Kelly was concerned that Blagojevich would have fewer board positions to award to contributors.  Kelly was also concerned that consolidation of the pension boards would reduce the ability of Rezko and Kelly to control or influence the pension boards because there would be fewer board members who were appointed by Blagojevich on the recommendation of Rezko and Kelly.  Monk understood that Kelly and Rezko had influence, or would get influence, over how the pension boards spent their money through the appointments Blagojevich had made or would make to the pension boards.  With that power, Kelly and Rezko would be able to influence which entities could provide financial and legal services to the

13

pension boards, and that this influence would either allow Rezko and Kelly to make money directly for Blagojevich, Rezko, Kelly, and Monk and/or to reward campaign contributors to Blagojevich.

Monk also had separate conversations with Rezko in which Rezko indicated that he was against the idea of consolidating the pension boards. Monk understood that Rezko was against the consolidation idea for the same reasons that Kelly had explained to Monk earlier. Rezko's main concern was that there would be fewer people Blagojevich could appoint to the boards and that, as a result, Rezko, Kelly, and Blagojevich would have less influence.

Ultimately, after learning about other political opposition to the consolidation idea, Blagojevich decided not to support it. Either Blagojevich or Monk then told Kelly and/or Rezko that the consolidation was not going to happen and they should not worry about it.

        b.     Rezko's Attempt To Obtain Campaign Contributions From John Wyma

John Wyma, a lobbyist and Blagojevich fundraiser, testified at Blagojevich's trial about one effort by Rezko and Kelly to extort a campaign contribution from investment companies seeking TRS investment.[6] In about early 2004, Wyma had relationships with two investment companies that were interested in being considered for investment by the TRS Board and contacted Kelly to get information and determine who was on the TRS

---

[6] Again, while the government does not anticipate Rezko will dispute Wyma's account or Rezko's involvement in this illegal activity, Wyma's trial testimony is available upon request.

Board. In approximately March 2004, Wyma met Kelly at a restaurant and asked how his clients could get on the list for consideration at TRS. In response, Kelly said, in essence, that TRS was Rezko's area. Kelly then called Rezko in Wyma's presence. Rezko did not answer, and Kelly left a message. Wyma later left the table briefly, and when he returned, Kelly said that Rezko had returned his call and told him it would be $50,000 to get on the list of recommended funds. Wyma understood Kelly to mean that there needed to be a $50,000 contribution made to Friends of Blagojevich if Wyma's investment companies were to be considered by TRS. Wyma's clients did not make any contribution, and did not attempt to receive any investment from TRS.

> c.  Rezko's Plans To Share TRS Kickbacks With Blagojevich and Others

Rezko inserted Aramanda as the recipient of $250,000 of the Glencoe Capital finder's fee in the beginning of 2004. However, Rezko did not share any portion of the $250,000 with Blagojevich, Kelly, or Monk. Instead, as Aramanda testified, Rezko directed Aramanda to use $50,000 of the $250,000 to pay off a debt that Rezko owed to another associate, but allowed Aramanda to keep the rest.

Within a few weeks of April 26, 2004, Rezko and Aramanda spoke again about Aramanda's participation in receiving finder's fees from TRS investments. Rezko explained that he thought that there would be more opportunities for Aramanda to receive fees like the one Aramanda received from Pekin and that Rezko could introduce Aramanda to a lot of Rezko's connections. Rezko offered Aramanda a $250,000 annual

salary to run a business obtaining finder's fees from companies seeking investments. Aramanda thought that this was a low salary in light of the amount of fees that Rezko had suggested the business would generate, and asked Rezko what was going to happen to the rest of the money. Rezko indicated that there were other people involved in addition to himself, and eventually identified Blagojevich, Kelly, and Monk as people that would also get a share of the money generated through the finder's fee business. Ultimately, Aramanda did not agree to work under that arrangement, and Aramanda did not receive any further fees.

Monk also had a conversation with Kelly in mid to late spring of 2004 in which Kelly indicated that he had just met with Levine (Monk thought that Rezko might have been present for the meeting as well but was not certain). Kelly indicated that he was impressed with Levine and Levine's ability to get things done at the TRS Board. From what Kelly said, Monk understood that Levine could steer business at TRS to make money, and that Kelly was going to work with Levine to make money for Blagojevich, Monk, Kelly, and Rezko through TRS.

### C.    Steering Money to Rod Blagojevich and Lon Monk

As part of his ongoing efforts to maintain his influence with the state government, Rezko provided hidden payments to Blagojevich and Monk from 2003 into 2005. Rezko gave Monk at least $70,000-$90,000 in cash from 2004 to 2005, typically in $10,000 increments which Rezko delivered to Monk personally. Rezko hid his payments to Blagojevich by disguising them as real estate commissions to Patricia Blagojevich, which

16

she did not earn, and by paying her a salary, which she did not earn. From 2003 through May 2004, when Rezko's payments to Patricia Blagojevich stopped (shortly after Levine was confronted by the FBI), Rezko paid Patricia Blagojevich over $150,000.

### 1. Hidden Payments To Patricia Blagojevich

#### a. August 2003 Unearned Commission

Around August 27, 2003, Rezko told Robert Williams, Rezmar's Chief Financial Officer, that Rezko wanted to get a check to Patricia Blagojevich. Rezko asked Williams how Rezmar might be able to associate the issuance of the check with one of Rezmar's projects. Rezko did not tell Williams that Rezko had an agreement with Patricia Blagojevich that required him to pay her or her company.

Based on Rezko's instructions to find a payment that looked legitimate, Williams determined that a payment of $14,369.50 could be made to River Realty, Inc., Patricia Blagojevich's small real estate firm, and made to look as if it were a 2½ percent commission on the sale of a housing unit that had recently closed in a development project that Rezko owned through another company. Williams did not believe that either Patricia Blagojevich or her company had done anything with respect to that sale, which had actually been handled by a sales agent who had an exclusive agreement to broker the sales of the units in the development project. Independent records and witnesses actually involved in the real estate sale confirm that Patricia Blagojevich had no involvement in the transaction and that the check to Patricia Blagojevich's company was illegitimate money that was simply masked by Rezko by being tied to the sale of the housing unit.

17

Williams went back to Rezko and told him that a unit in the development project had recently closed and a check could be issued to River Realty, Inc. as a commission related to that transaction if Rezko desired. Rezko agreed. Williams directed Rezmar staff to prepare a $14,369.50 check made payable to River Realty, Inc., which was ultimately deposited into a bank account in the name of River Realty, Inc.

b.    Unnecessary Retainer Fees From Rezmar

In around October 2003, Patricia Blagojevich entered into a contract on behalf of her company with Rezmar in which River Realty, Inc. agreed to perform unspecified real estate brokerage services to Rezmar in exchange for a monthly retainer of $12,000 plus the possibility of additional commissions depending on the amount of deals brokered. Beginning in October 2003, at Rezko's direction, Williams prepared a series of $12,000 checks pursuant to that agreement, which Williams delivered to Rezko or his assistant. Ultimately, Rezmar issued 8 separate $12,000 checks, totaling $96,000, to River Realty, Inc. on approximately a monthly basis from October 2003 through May 2004. In about May of 2004, Rezko told Williams that Rezmar would not be issuing any more of these monthly checks to River Realty, Inc.

Employees at Rezmar were not aware of services that River Realty, Inc. provided to Rezmar that justified the payments made under the contract. For example, Williams was not aware of any properties that Rezmar acquired based on Patricia Blagojevich's efforts from October 2003 through May 2004, and understood that other Rezmar employees and officers were responsible for identifying real estate opportunities prior to

18

and during this period of time.

Michael Winter observed Patricia Blagojevich in the Rezmar offices from time to time, although Patricia Blagojevich often had a child with her and usually left soon after she arrived. At some point after the spring of 2003, Rezko asked Winter to involve Patricia Blagojevich in business activities that Winter conducted on behalf of Rezmar. Winter knew that Patricia Blagojevich was being paid by Rezmar. Rezko said to Winter words to the effect that "We are paying [Patricia Blagojevich] this money, I would like you to get her involved in things that you are doing," which Winter understood was a reference to the money that Patricia Blagojevich was making under her contract. While Winter made a few efforts to include Patricia Blagojevich in his business affairs, to his knowledge, she was not able to make a significant contribution. On a few occasions, Rezko told Winter that Patricia Blagojevich had referred a property to Rezmar to see if Rezmar was interested in buying and developing the site. To Winter's knowledge, the properties Patricia Blagojevich identified were not suitable for Rezmar, and Rezmar did not purchase any of the properties that Patricia Blagojevich referred. At one point, Winter told Rezko that he thought that Rezmar's hiring of Patricia Blagojevich was not a good idea. Winter said that he thought that it was a bad idea to have someone on retainer for the type of work that it was contemplated that Patricia Blagojevich would be doing for Rezmar.

Monk talked with Rezko about the issue of Patricia Blagojevich going to the Rezmar office. Based on what Rezko said, Monk understood that Rezko was willing to

19

do whatever it took to get Patricia Blagojevich money, whether it was from a monthly retainer or through hiring her to work on his development at Roosevelt and Clark. Rezko did not seem to care if she actually did anything to earn the money. Rezko was only concerned about ensuring that Blagojevich did not have to worry about his finances.

c.    Unearned January 2004 Commission

In or about January 2004, while Rezmar was paying Patricia Blagojevich $12,000 a month, Rezko directed to Patricia Blagojevich a payment of $40,000, purportedly for brokerage services in connection with the sale of property at 1101 West Lake Street, Chicago, Illinois, even though the sale of the property had been arranged without her assistance. Brian Hynes, a lawyer and lobbyist connected to Rezko, purchased two units of a building at 1101 West Lake Street in Chicago, Illinois from Tim Sullivan and Sean Conlon.

Hynes did not negotiate the purchase price for the two units on Lake Street with either Sullivan or Conlon but instead agreed to pay the asking price. The asking price that Hynes agreed to pay did not include a brokerage fee because Hynes had not used a broker to identify or negotiate the purchase of the units. Hynes found and negotiated the purchase of the two units on his own. Although Hynes did not need a broker, Hynes offered Rezko the opportunity to be a broker on his purchase of the two units. Rezko directed the brokerage fee to Patricia Blagojevich.

As Sullivan and Conlon refused to pay any part of the brokerage fee, the price of the two units was increased to cover the cost of the brokerage fee. None of the

20

individuals involved in the sale of the units was aware of Rezko, Rezmar, Patricia Blagojevich, or her company doing any work to earn the brokerage fee.

### 2. Hidden Payments To Lon Monk

Beginning in about the spring or summer of 2004, Rezko also provided Monk with cash in amounts of about $10,000 on at least seven to nine occasions. Monk did not ask for the money – Rezko decided when and how much money to provide to Monk. Typically, Rezko provided Monk the cash in an envelope when the two were alone. Monk understood that the money was gift, and thought of the money as a kind of advance on the money that Blagojevich, Rezko, Monk, and Kelly were going to make together.

### D. Corrupt Activities Involving Ali Ata and the Illinois Finance Authority

#### 1. Solicitation of Campaign Contributions from Ali Ata In Exchange for a State of Illinois Position

In or about 2002, Ali Ata had several conversations with Rezko regarding the possibility of a high level appointment for himself in state government should Rod Blagojevich be elected. At Rezko's direction, Ata put together a list of three state agencies to which he would be interested in being appointed.

In or about August 2002, Ata held a small fund-raising event for Blagojevich that Blagojevich attended. In advance of that fund-raising event, Ata committed to Rezko that Ata would raise $25,000 at that event, which he eventually did, personally contributing at least approximately $5,000.

Later that year, at Rezko's request, Ata agreed to contribute an additional $25,000 to Blagojevich. Ata brought the $25,000 check to Rezko's offices, and Rezko brought Ata to see Blagojevich, who was in a conference room. There, Rezko placed the envelope containing Ata's $25,000 check on the conference room table between himself and Blagojevich and stated to Blagojevich that Ata had been a good supporter and a team player and that Ata would be willing to join Blagojevich's administration. Blagojevich then asked Rezko if he (Rezko) had talked to Ata about positions in the administration, and Rezko responded that he had.

After this meeting, Ata completed an application for a state appointment. In or about early 2003, Rezko informed Ata that he was going to be appointed to head the state Capital Development Board. Rezko subsequently informed Ata that this position was going to someone else and that another position would have to be found for Ata. Later, Rezko discussed an opportunity for Ata with the newly formed Illinois Finance Authority ("IFA").

In or about July 2003, Rezko asked Ata to make an additional $50,000 contribution to the campaign of Blagojevich. Ata agreed to contribute the same amount as he had previously, namely $25,000, and gave Rezko a check payable to Blagojevich's campaign on or about July 25, 2003. Thereafter, Ata had a conversation with Blagojevich at a large fund-raising event at Navy Pier. During this conversation, Blagojevich told Ata that he had been a good supporter, indicated that Blagojevich was aware that Ata had made another substantial donation to Blagojevich's campaign, and told Ata that

22

Blagojevich understood that Ata would be joining Blagojevich's administration. Ata responded that he was considering taking a position, and Blagojevich stated that it had better be a job where Ata could make some money.

Thereafter, Rezko told Ata that he could have the Executive Director position of the IFA on the condition that Ata agree to report to Rezko. Ata agreed, and thereafter met regularly with Rezko to keep him apprised of developments relating to the IFA and other matters. Ata began working in an unofficial capacity in this position in late 2003, and was officially appointed the Executive Director of the IFA in January 2004 after the IFA Board voted on his nomination.[7] Thereafter, Ata continued to meet with Rezko regularly as previously agreed.

### 2. Rezko's Use of His Influence With Ata To Benefit Himself

In about February 2004, Rezko used his influence with Ata to attempt to financially benefit himself. At that time, Rezko was trying to arrange for General Electric Capital Corporation ("GECC") to refinance a $3.6 million loan that was held by Paul Ray, an associate of Rezko's, in connection with some Papa John's restaurants in Milwaukee. Rezko wanted GECC to refinance the loan as part of Rezko's efforts consolidate his ownership of Papa John's restaurants in the Midwest. At the time, Rezko was significantly behind on loans he owed to GECC, so he could not ask for refinancing

---

[7] A sham candidate who did not even know he was nominated for the position of head of the IFA was put up as the second candidate to run against Ata for the Executive Director position. Ata was approved unanimously and the sham candidate did not get a single vote. The only connection between the sham candidate and the administration was that the sham candidate was a passing acquaintance of Kelly.

himself.

In an effort to persuade GECC to approve the refinancing, Rezko arranged for Ata, who was then the Executive Director of the IFA, to sign a letter on IFA letterhead which represented that the IFA would guarantee a portion of a related transaction. The letter, as Rezko knew, was a fraud. The IFA had not made any such decision. Ata signed the letter based purely on oral representations that Rezko made to him about Rezko's pizza business. Ata had previously told Rezko that what Rezko wanted IFA to do was unprecedented and would require approval by the IFA Board. Rezko agreed to provide the necessary documentation. Rezko told Ata that he had received approval from the Office of the Governor to do this. Ata ultimately signed the letter, which Rezko had dictated, because Ata thought that Rezko would actually make a formal application for the funds and because Ata felt that he would lose his job if he refused.

Ata subsequently had second thoughts about providing the letter to Rezko, and told Rezko that IFA would not provide the financing that was promised in the letter. Rezko assured Ata that he had not used the letter, would not use the letter, and would return the letter to Ata. In fact, contrary to his assertions to Ata, Rezko faxed the fraudulent letter to GECC in an effort to secure the financing he wanted. Ultimately, GECC did not provide the financing that Rezko sought, notwithstanding the letter.

## III.    REZKO'S FRAUD FOR HIS PERSONAL BENEFIT

### A.    <u>Investment Fraud Involving GECC</u>

Rezko has pleaded guilty to his role in defrauding GECC in connection with a

24

series of loans that Rezko obtained from GECC using false paperwork and straw buyers. As a result of that fraud, GECC suffered a loss of over $4 million when the fraudulent loans that Rezko arranged went bad.

Rezko arranged for the fraudulent loans in connection with his ownership of several fast food franchise businesses, including Papa John's pizza restaurants, which were operated under the umbrella company Rezko Enterprises ("RE"). Various individual investors, in addition to Rezko, owned shares of RE (the "Investors").

In an effort to obtain more loan money from GECC than Rezko would have otherwise been able to obtain, Rezko recruited some of his employees, Individuals A and C ("the Buyers"), to assist him by establishing new companies, acting as purchasers, and applying for loans to GECC. Rezko explained to Individuals A and C that, while they would own the new companies and the restaurants that they acquired from RE, the pizza restaurants would continue to operate as they had before. Rezko also assured these individuals that they would not have to put any of their own money at risk and, to the extent that their group of restaurants was profitable, they could expect to receive a bonus from the defendant in the future. Rezko concealed from GECC that the Buyers were not going to personally contribute equity to purchase the restaurants from RE.

Between 2001 and 2004, Rezko orchestrated the sale of the majority of RE's pizza restaurants in four separate transactions, each of which was financed by GECC. In three of those transactions, Rezko concealed from GECC undocumented agreements he made with the Buyers that were material to GECC because they made it appear that the Buyers

25

actually had put money into the deal, when in fact, the Buyers had not done so.

### 1. Fraud Related to the Milwaukee Stores

Individual A agreed to act as a buyer of RE's Papa John's stores in the Milwaukee area. Individual A completed the necessary GECC loan application paperwork, which included false documents relating to the overhead expenses at the Milwaukee stores.

In order to increase the amount of money that GECC would lend, Rezko arranged for Individual A to execute a false promissory note, which was provided to GECC around the time of the closing. The promissory note was false because Rezko told Individual A that he did not intend to enforce the note -- a fact that was concealed from GECC.

In or about March 2001, in reliance on this false and misleading loan paperwork, GECC lent Individual A's company approximately $4.5 million to purchase the Milwaukee stores from RE. After some months, there was a falling out between Individual A and Rezko, and Individual A began operating the Milwaukee pizza stores independently. Ultimately, after Individual A complained, Rezko arranged for another individual to purchase the Milwaukee restaurants, which led to Rezko's fraud involving Ali Ata, the IFA, and GECC (described above).

### 2. Fraud Related to the Chicago Stores

Rezko structured another fraudulent loan with GECC involving certain Chicago-area stores, using the same formula employed in the Individual A transaction. In this transaction, Rezko decided to spin the stores off to an entity that he owned, Chicago PJ. As before, Rezko inflated the loan proceeds he got from GECC by submitting false

26

financial information about the Chicago stores. Rezko also again used fake promissory notes that he did not intend to enforce to entice GECC to make the loan. As a result of Rezko's fraud, GECC lent Rezko's company, Chicago PJ, approximately $6.13 million in or about September 2001.

### 3. Fraud Related to the Detroit Stores

After the Chicago PJ deal was completed, Rezko asked Individual C to purchase on paper a group of stores in the Detroit and Chicago market areas. Individual C agreed to do so. Rezko understood that Individual C was not actually going to buy the stores -- the deal was simply structured to fool GECC into making additional loans that GECC would not otherwise have made.

As in the prior transactions, Rezko and Individual C arranged to submit false financial statements to GECC. Again, Rezko entered into a fake promissory note with Individual C, which Rezko did not intend to enforce, so that GECC would think that Individual C was an actual buyer. In reliance on the false statements contained in the Individual C loan application materials, including those caused to be made by Rezko, GECC lent Individual C's business $2.6 million in or about December 2001.

### 4. Rezko's Fraud on Investors

A number of Rezko's friends and associates were investors in Rezko Enterprises. Rezko deceived those investors about the true nature of his transactions involving the Papa John's restaurants described above. In particular, while Rezko caused RE to sell the restaurants, at least on paper, he never revealed this fact to the RE investors. Instead, the

27

defendant represented to the investors, and caused others to represent to the investors, that the pizza restaurants were "refinanced." While he presumed that some of the investors knew that the "refinancing" involved actual sales, defendant concealed the true nature of the transactions from them during investor meetings and in presentation materials.

### B.     Fraud Involving City and County Contracts

Rezko also engaged in fraud against the City of Chicago and Cook County by falsely representing that Crucial, Inc. and Crucial Communications, two companies that Rezko actually owned and controlled, were minority business enterprises. Beginning in the late 1990's until about 2005, Crucial, Inc. held contracts to operate Panda Express restaurants at O'Hare airport. Crucial Communications held sub-contracts to provide phone services to Cook County jail from about 1999 to about 2006. In order to obtain and maintain those concessions, Rezko caused both businesses to file false forms certifying that in fact they minority-owned. Rezko arranged for an associate of his, who was a minority, to sign the forms that were submitted to the City and County as part of this process. The two companies earned many hundreds of thousands of dollars for Rezko.

## IV.    APPLICATION OF § 3553 FACTORS

A sentence of between 11 and 15 years' imprisonment is appropriate in this case because the factors set forth in 18 U.S.C. § 3553 weigh in favor of such a sentence. In particular, the nature of the crime, the need for deterrence, the need to avoid disparities among Rezko's co-defendants, and Rezko's history and past actions all favor the sentence

recommended by the government.[8]

A.   **Legal Standards**

Section 3553(a) sets forth the factors to consider when determining a sentence that is sufficient, but not more than necessary.  In particular, Section 3553(a) requires that the court ensure the sentence imposed properly considers, among other factors: (1) the nature and circumstance of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence; and (4) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. §3553(a).

District courts, while not bound by the Sentencing Guidelines, must take them into account in calculating a defendant's sentence.  *See Booker v. United States*, 125 S.Ct. 738, 767 (2005).  Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Sentencing Guidelines are the *sole* factor in Section 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, Section 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain

---

[8] Based on those factors, the government is departing from the sentencing range called for by a strict application of the Guidelines.

an essential tool in creating a fair and uniform sentencing regime across the country.").

In the instant case, the properly-calculated Guidelines recommend a sentencing range of natural life. The range is, in part, a product of amendments to Guideline § 2C1.1 that took effect on November 1, 2004, based on "the [Sentencing] Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses." *See* U.S. Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 666, pg. 82.

**B.    The Nature Of Rezko's Crimes Weigh In Favor Of a Significant Sentence**

Rezko's public and private corruption exacted a heavy toll on his victims. As a result, the nature of his crimes weigh heavily in favor of a significant punishment under § 3553(a)(2)(A).

The charged fraud scheme exacted significant damage upon the people of the State of Illinois and the beneficiaries of TRS. Every scheme that deprives the public of the honest services of a public employee undermines the trust that is necessary for good governance. This scheme, however, was particularly malignant because of the particular state agencies that were targeted. By corrupting the Planning Board, the defendant corrupted the process which determined where hospitals were built and medical care is provided in the State of Illinois. By corrupting the investment process at TRS, the defendant put at risk hundreds of millions of dollars of taxpayer money and the retirement funds for thousands of Illinois teachers, in addition to jeopardizing the faith in the

30

retirement system that is supposed to be a bedrock of support for thousands of teachers.

That description of Rezko's public corruption, of course, does not do justice to all the breathtaking fraud that Rezko sought to accomplish with Blagojevich, Kelly, and Monk. They intended to convert their power over the State's affairs into millions of dollars for themselves, and Rezko was the idea man and point person in those efforts. But the harm they caused was not limited to the dollars they tried to steal – it was a profound theft of the duty of honest services owed by the very top officials in Illinois to the people of Illinois, with a seriously corrosive effect on public confidence in state government.

The cost of Rezko's fraud against GECC is more easily measured, but also significant. It was not just the $4.5 million that GECC lost on loans that it would not have issued if the company had understood the extent of Rezko's financial problems. It also includes the lies and deceit that Rezko practiced upon the investors in his businesses, who lost any opportunity to save their investments because Rezko hid the truth from them.

### C. The Need For the Sentence Imposed To Provide Deterrence

Rezko's sentence should also be considered in the context of the deterrence that it will provide against further crimes of this sort. *See* 18 U.S.C. § 3553(a)(2). In this instance, the sentence the government recommends would send an important and appropriate message: there are significant risks for even highly-placed insiders who are tempted to abuse their positions of power. It is precisely this kind of insider dealing that has done so much damage to the citizens of this State.

31

The need for deterrence is particularly strong with respect to people like Rezko – a kitchen cabinet member who held no official title, and thus was not subject to many of the laws that are designed to hold actual public officials accountable for their actions. For example, despite his immense power, Rezko took no oath of office, owed no duty of honest services to the people of Illinois, was not bound by *ex parte* rules, filled out no economic disclosure forms, and filed no campaign contribution disclosures. Rezko even largely escaped scrutiny from the press until the government's investigation prompted further digging.

The ability of insiders like Rezko to commit extensive fraud without meaningful oversight underscores the need to send a strong message of deterrence when they are caught criminally taking advantage of their influence. This case demonstrates the strong need to deter the abuse of trust by those in power behind the scenes. Accordingly, the factors discussed in 18 U.S.C. § 3553(a)(2) weigh in favor of the sentence recommended by the government.

### D.  The Need To Avoid Unwarranted Sentence Disparities

The government agrees with Rezko that his sentence should be determined in the context of 18 U.S.C. 3553(a)(6), which directs the Court to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Rezko argues that he should receive a sentence of time served because he is similarly situated to others who cooperated with the government and received sentences less than 45 months. No government cooperator or other defendant

32

Rezko mentions, however, approaches the level of criminal conduct in which Rezko engaged in except one – Stuart Levine. But Levine, whose criminal culpability is roughly equivalent to Rezko's, provided cooperation that was dramatically more valuable and timely than Rezko's. As a result, Section 3553(a)(6) also weighs in favor of the significant sentence recommended by the government.

### 1.    Rezko's and Levine's Criminal Pasts

The government does not lightly suggest that Rezko and Levine have similar levels of culpability with respect to their past crimes. It is well aware of the long list of crimes to which Levine has admitted. But the list of crimes that the government has proven against Rezko is almost as long, and in some significant ways, is worse. As a result, the government believes that Rezko and Levine should be viewed as comparable for purposes of Section 3553(a)(6).

One significant way in which Rezko's criminal behavior is worse than Levine's is in the context of the public corruption occurring during the Blagojevich administration, which is the heart of the charges against Rezko before this Court. Levine's corrupt activities on the Planning Board and TRS were deplorable – but Rezko joined fully in those efforts, beginning with his efforts to direct finder's fees from Glencoe and Sterling and his agreement to give Mercy Hospital its CON in exchange for a bribe in 2003. Rezko ultimately became aware of all the fraud that Levine planned involving the State of Illinois except for the shakedown of Edward Hospital – and Levine testified credibly that he would have shared that information with Rezko, indeed, would have been forced to

share that information with Rezko, in order to get Edward Hospital its CON.

Rezko, on the other hand, was engaged in even more far-reaching and harmful frauds against the State of Illinois than the ones he joined with Levine. From the very beginning of Blagojevich's regime, Rezko had been actively plotting with Blagojevich, Kelly, and Monk, literally sitting in a room with the Governor of Illinois criminally scheming how they could make millions of dollars together. Rezko had access and influence in a way that Levine could only dream about, and Rezko abused that access and influence on a scale that surpassed even what Levine planned to do at the Planning Board and TRS. Further, as demonstrated by the testimony of Richard Driehaus at Rezko's trial and John Wyma's testimony about how he was informed that a $50,000 contribution would be required to help a client get TRS work, Rezko was capable of initiating fraud at TRS without Levine's help.

Contrary to Rezko's suggestion that he engaged in fraud only because he was invited to do so by Blagojevich, part of Rezko's fraud against the state was done without Blagojevich's knowledge and to benefit only Rezko. For example, Rezko directed his $250,000 share of Pekin's finder's fee to Aramanda (of which Rezko received a direct benefit of $50,000) without informing Monk or Blagojevich. Similarly, Rezko acted solely for his own benefit when he got Ali Ata to write the fraudulent letter on IFA letterhead to assist Rezko get financing from GECC. Blagojevich and Monk were not going to share in any profit that flowed from Rezko's refinancing, nor did Rezko inform them in advance of what he did. Thus, in this context, Rezko's culpability exceeds that of

34

Levine's.

In the government's view, the situation is reversed when considering the fraud that Rezko and Levine committed in their personal lives outside of the State of Illinois. In that context, Levine's history of corruption is more extensive than what the government can prove of Rezko's, but the comparison is not as one-sided as Rezko suggests.[9] Levine engaged in a series of multi-million dollar frauds and attempted frauds that targeted charities, the Roosevelt Franklin University, and the estate of Ted Tannenbaum.[10] Rezko, however, also engaged in a long-standing series of lies and deceit with respect to GECC and his investors, many of whom were close personal friends of Rezko. Rezko's fraud there ultimately cost GECC over $4 million and prevented his investors from withdrawing from what ultimately was a doomed investment. Rezko also made hundreds of thousands of dollars through fraudulent contracts with the City of Chicago and Cook

---

[9] The government notes that Levine's history of personal corruption is so well-known only because Levine agreed, pursuant to his cooperation, to allow the government to use his proffer-protected admissions against him and also testified about his prior bad acts, thus opening himself to extensive cross-examination on his prior acts. Rezko has neither testified, been subject to invasive cross-examination on the totality and minutia of his criminal conduct, nor agreed to forgo the protections in his proffer with the government, so the government is relying purely on what it could prove independently of Rezko's protected admissions.

[10] Rezko argues in part that Levine has more criminal culpability because of Levine's use and distribution of illegal drugs. Levine's use of drugs was criminal. It was also criminal when he purchased drugs and gave them to his friends for their use. None of those crimes, however, would have the slightest effect on his guidelines range, nor would they trigger any mandatory minimums. Nor is it the practice of the United States Attorney's Office to prosecute individuals for their own personal drug use or for user-quantity drugs that they give away for free to their friends. Levine's drug use was relevant to his memory and perceived credibility as a witness, but Rezko's contention that Levine was given some benefit because he did not plead to possessing or distributing drugs is frivolous.

County.

### 2. Rezko and Levine's Cooperation

From the government's perspective, the major difference between Levine and Rezko is not the quality or quantity of their past crimes – both Rezko and Levine are guilty of terrible crimes. The major difference between Levine and Rezko is that Levine's cooperation with the government has been truly remarkable, while Rezko's has not. For his many faults, Levine's cooperation is directly responsible for convictions in difficult and important cases against, among others, Rezko, William Cellini, and Edward Vrdolyak. Levine cooperated pro-actively, wore a wire, did not obstruct his investigation or prosecution, and did not put the government through a trial before choosing to cooperate. In contrast, the best that can be said of Rezko's cooperation is that, after obstructing the government's investigation and his court proceedings and going to trial, he helped the government develop several witnesses who testified against Rod Blagojevich. The timing, quality, and utility of Rezko's cooperation pales in comparison to Levine's. As a result, while Rezko and Levine are roughly equivalent when it comes to their past crimes, Rezko deserves a significantly higher sentence than Levine because Levine's cooperation was so superior to Rezko's.

### a. Levine's Plea Agreement

To a certain extent, the government has come to its sentencing recommendation for Rezko by following the same approach it took when determining Levine's sentence under his cooperation deal. Accordingly, an explanation of Levine's plea agreement is

36

necessary to explain the government's reasoning with respect to its sentencing recommendation for Rezko.

After determining through lengthy proffer sessions that Levine could provide substantial assistance, the government negotiated a plea agreement with Levine. As part of that agreement, the government allowed Levine to plead guilty in just one of the two indictments it brought (although he admitted all the allegations brought against him in both indictments). To determine the extent of Levine's benefit for cooperating, the government first calculated Levine's guidelines range. As part of this calculus, the government used the 2003 Guidelines rather than the 2005 Guidelines, which were in effect by the time that Levine pleaded guilty. This was a benefit to Levine because the 2003 Guidelines had a significantly lower guidelines range than did the 2005 Guidelines.[11] Under the 2003 Guidelines, the government determined that Levine faced a sentencing range of 151-188 months on the mail/wire fraud charges he faced. Following its usual practice, the government then made a reduction in that range based on the value of Levine's expected cooperation, which resulted in an agreed upon recommendation that Levine receive a sentence of 67 months.

---

[11] The government was willing to make this concession because it was the understanding of both Levine and the government that the 2003 Guidelines would apply to him when he began cooperating. The state of the law that permitted the use of the 2003 Guidelines, however, changed with *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), which was issued after Levine had already delayed his plea and sentence to proffer with the government. The same reasoning does not apply to Rezko, who chose not to cooperate until 2008, after the Guidelines had already changed.

b.     Rezko's sentencing range under the 2003 Guidelines

While Rezko has not cooperated as fully as Levine, the government agrees that it would be appropriate to consider the result that would follow if Rezko's sentence were determined by the same procedure as Levine's.  In other words, the government suggests that under the unusual circumstances of this case, it is reasonable to approach Rezko's sentencing as if he were being sentenced in just one case and to use the 2003 Guidelines to calculate his sentencing range prior to any downward adjustments for any mitigating factors, including his cooperation.  This approach gives Rezko several significant benefits:  1) applying the 2003 Guidelines result in a significantly lower range than the current Guidelines; 2) grouping all the criminal conduct alleged in both indictments effectively means that Rezko receives no additional punishment whatsoever for the GECC fraud; and 3) treating the two indictments as one ensures that Rezko will not be sentenced in either case as if he had three criminal history points.

Under this approach, Rezko's sentencing range would be 188-235 months.  The government's calculations of Rezko's 2003 Guidelines are as follows:

1.     Pursuant to USSG §2C1.1(a), the base offense level for the mail/wire fraud and bribery counts is 10.

2.     Pursuant to USSG §2C1.1(b)(1), the offense level is increased by 2 levels because the offense involved more than one bribe.

3.     Pursuant to USSG §2C1.1(b)(2), the offense level is increased by 20 levels

because Rezko's intended loss was between $7 million and $20 million.[12]

4.       The offense level for the mail/wire fraud and bribery counts is 32.

5.       Pursuant to USSG §2S1.1(a)(1), the base offense level on the money laundering counts is 32 based on the level applicable to the mail/wire fraud offenses.

6.       Pursuant to USSG §2S1.1(b)(2)(B), the offense level is increased by 2 levels because Rezko was convicted under 18 U.S.C. §1956.

7.       Pursuant to USSG §3C1.1, the offense level is increased by 2 levels because Rezko obstructed justice.

8.       Rezko receives no deduction for acceptance of responsibility.

9.       After applying the grouping rules, Rezko's total adjusted offense level is 36, which results in a sentencing range of 188-235 months under criminal history category I.

Rezko's sentencing range (188-235 months) ends up being higher than Levine's (121-151 months), but primarily because Rezko qualified for an obstruction of justice enhancement and did not receive an adjustment for acceptance of responsibility.[13] This is appropriate, given that Levine pled guilty without going to trial and did not obstruct

---

[12] Under the government's calculations, Rezko is accountable for $9,675,000 in intended loss in this case and an additional $4,120,756 in intended loss in case number 06 CR 729. The addition of the $4,120,756 in intended loss from case number 06 CR 729 does not increase Rezko's guidelines range because it does not increase the intended loss above $20 million. Further, the government did not add an enhancement for abuse of trust or for Rezko's supervisory role, both of which would be appropriate in case number 06 CR 729, in this calculation. As a consequence, under this approach, Rezko does not suffer any additional sanction under the Guidelines for his conviction in 06 CR 729.

[13] The government held Levine accountable for over $20 million in fraud (as compared to Rezko's fraud loss range of $7 million-$20 million), so Levine actually was penalized an additional 2 levels under the Guidelines because he engaged in more personal fraud than Rezko.

justice.

c.     The Value of Levine's Cooperation

The government anticipated, correctly, that Levine's cooperation was going to be truly exceptional in the sense that matters the most – the government was able to convict people of extremely serious charges who otherwise would not have been charged. Levine's cooperation was essential to bringing the instant case against Rezko, but went far beyond that. Because Levine kept his relatively early decision to cooperate secret, Levine was able to record conversations with Edward Vrdolyak that eventually forced Vrdolyak to plead guilty to serious fraud charges. Levine's cooperation also led to the recent conviction of William Cellini, the conviction of Robert Weinstein, and the conviction of John Glennon. Levine is also expected to testify, if necessary, against Nicholas Hurtgen.

d.     The Value of Rezko's Cooperation

The government agrees that Rezko's sentence should be reduced because of his efforts to cooperate. But, as with Levine, the value placed on that cooperation should be viewed based on the tangible results that flowed from Rezko's cooperation. In fact, Rezko's cooperation resulted in only modest benefits to the government, and any reduction in his sentence should be similarly modest.

Rezko's cooperation resulted in three tangible benefits to the government's investigation and prosecution of Rod Blagojevich:

1.     The government believes that Rezko significantly helped the government

40

come to an agreement with Joseph Aramanda that resulted in Aramanda providing information to the government. The government ultimately called Aramanda as a witness in the first trial against Rod Blagojevich.

2. The government informed Lon Monk's attorney that Rezko was providing information about Monk before Monk decided to cooperate with the government in February 2009, and the government believes that Rezko's cooperation played a role in Monk's decision to cooperate with the government. The government also used information provided by Rezko about the cash payments he provided to Monk as a basis to require Monk to agree to pay a fine as part of Monk's cooperation deal. Monk testified against Rod Blagojevich in both trials.

3. Information provided by Rezko about John Wyma led the government to issue a grand jury subpoena and pursue an interview with Wyma in the Fall of 2008. Ultimately, the information that Rezko provided was not substantiated, and Wyma credibly denied any wrongdoing. However, as Wyma has testified, the issuance of the subpoena was what initially led to his decision to interview with the government and it was at this pivotal time that Wyma became aware of illegal activity by Blagojevich and others that he then provided information about to the government. Rezko's cooperation was made known to Wyma's attorney, and may have played some role in the timing of Wyma's decision to cooperate with the government.

The government acknowledges that Rezko tried to provide additional assistance. Rezko made several covert recorded calls, asked others to provide vicarious cooperation on his behalf, and answered questions he was posed about others. Ultimately, however, none of those efforts yielded any useable additional evidence, let alone charges. As a result, the government does not view those additional efforts as being worth any additional discount.

Rezko suggests that he deserves credit for being available to testify for the government. The government did consider calling Rezko as a witness, asked him to delay

his sentencing, and disclosed Rezko as a potential witness at the Cellini trial (albeit with the qualifier that it was "very unlikely" that the government would call him). The government ultimately chose not to call Rezko, largely because it believed that the value of the information he could have provided was overwhelmed by the attacks that could be made on Rezko's credibility.

Rezko would have had obvious credibility issues based on his desire to decrease his sentence and his lengthy history of fraud and deceit. But Rezko further damaged his own credibility as the result of his decisions in this case. In short, Rezko's cooperation was heavily tainted by the timing of when he decided to cooperate, by his repeated lies to judges, and by his pervasive and sustained lies made to the government over the first several months of his purported cooperation with the government. In particular:

1.      Rezko decided to cooperate only after he had been found guilty at a trial.[14]

_____

[14] Rezko suggests that the government may "punish" him for exercising his right to trial. Def Mem at 27-28. The value of Rezko's cooperation, however, is tied up with that decision. Further, it is a legitimate consideration for the government in evaluating cooperation to factor in the savings of governmental resources that result from defendants who no longer contest their guilt. *See United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990) ("The defendant's foregoing his right to trial is an important consideration in virtually every plea bargain, because the government does not have the resources to try every criminal defendant");*United States v. Whitlow*, 287 F.2d 638, 640-641 (7th Cir. 2002) (noting that a prosecutor who must defend an appeal filed despite a plea agreement that includes an appellate waiver has lost the resources sought to be conserved by the appellate waiver and, accordingly, may withdraw concessions made in the plea agreement). For example, Levine has agreed to an appellate waiver, which will save the government resources down the road. Rezko has never agreed to any such waiver. Indeed, Rezko has continued to litigate his guilt even after he ostensibly started to cooperate with the government, such as by filing motions seeking to vacate his convictions in 2010. That continued effort to deny his guilt both forced the government to expend resources and could also have been used to impugn Rezko's credibility, as it raised questions about whether Rezko would have admitted his conduct even on matters that had been resolved at trial. Rezko is certainly

(continued...)

The timing of his decision not only forced the government to use significant resources to convict him, it also significantly affected his credibility because he could be cross-examined about his failure to cooperate until he lost at trial and also about his exposure to the testimony of other witnesses, particularly Levine;

2.      Rezko obstructed justice by lying during the bond proceedings in this case. His lies under oath to this Court would provide obvious fodder for cross-examination. Rezko compounded this perjury by writing a letter to the Court which he tried to win his release from jail by falsely claiming 1) that he had done nothing wrong with Blagojevich; and 2) that the prosecution was putting pressure on him to lie about Blagojevich. Not only was this a false statement to a judge; it was a false statement exculpating one of the key people against whom Rezko might have cooperated;[15] and,

3.      Rezko began proffering to the government in July 2008. In the course of his first 19 interviews with the government, Rezko consistently denied that he tried to obtain money for himself through his relationship with Blagojevich or through the State of Illinois (with very limited exceptions that the government had proven at his trial).[16] The government was highly skeptical about those claims, and repeatedly questioned Rezko on that point in a variety of contexts. Ultimately, it was not until Lon Monk cooperated with the government beginning in February 2009 that the government learned of the true scope of Rezko's criminal activities with Blagojevich, Monk, Kelly, and others. On March 17, 2009, the government confronted Rezko with the information that it had obtained from Monk. After that

---

[14](...continued)
entitled to exercise his constitutional rights, but the government and this Court are also entitled to consider his refusal to forgo those rights in assessing his cooperation.

[15] Levine lied to pretrial services about his drug use, but the government did not regard Levine's lie, which did not deal with the substance of Levine's potential cooperation, as being nearly as damaging to Levine's credibility as Rezko's lies were to his.

[16] The government believes that Rezko's characterization of his cooperation with the government is not consistent with the substance of his proffer interviews. Accordingly, the government believes that it is entitled to rely on the substance of Rezko's statements in the proffer to the limited extent necessary to rebut the inference that Rezko's lack of candor with the government was simply to protect Monk. If the Court has any concern with the government's limited use of Rezko's proffer statements here, the government can provide the Court with the proffer reports at issue.

point, Rezko provided additional information to the government, which made it at least possible that the government could have called him as a witness. Rezko's persistent failure to tell the truth to the government over his first 19 interview sessions raised serious questions about whether Rezko's testimony could be accepted by a jury.[17]

Rezko's value as a cooperator was potentially most significant in the investigation of Rod Blagojevich. Rezko's actions, however, precluded the government from relying on his information either during the investigation or at Blagojevich's trials. For example, the government obtained wiretaps on phones used by Blagojevich in October 2008, months after Rezko started cooperating. In its initial application for wiretapping authority, however, the government felt it necessary to disavow reliance on anything that Rezko had said, and included the following passage in its application:

> Antoin "Tony" Rezko, whose reliability has yet to be determined, has confirmed to the government in interview proffer sessions [certain information provided by Ali Ata about Blagojevich]. Rezko's proffers have been substantial but are not complete. Rezko is proffering with the government in hopes of receiving a recommendation from the government for a reduced sentence. The government has concerns that Rezko may be minimizing the extent of criminal conduct of himself and others, but to date has not seen indications that Rezko has fabricated any information incriminating anyone else. During the proffer sessions, Rezko at times has had accounts that differ from some of the witnesses, like Ata, but in broad terms Rezko's account flatly incriminates Governor Rod Blagojevich in a "pay to play" criminal scheme. Because the government is not yet fully satisfied that

---

[17] Levine also lied to the government during the course of his cooperation, but the circumstances were significantly different. In Levine's third interview session, he was asked literally one or two questions about Edward Vrdolyak and a bribe involving Compdent. Levine lied to the government, which caused the government to stop the interview. After conferring with his attorney, Levine admitted that he had lied, and admitted that Vrdolyak was involved in the bribe. After that point, the government is not aware that Levine lied about anything. Rezko's extended lies about the issues critical to the investigations continued over months in the face of repeated challenges by the government, and presented a much more serious threat to Rezko's credibility.

Rezko's accounts are full and complete, the government is not relying on Rezko's account for probable cause. The government simply notes that while Rezko's account varies at times from other witnesses, Rezko's account of Governor Rod Blagojevich's activity, on balance, would add to the probable cause set forth herein, not subtract.

To illustrate the damage that Rezko did to his own credibility and the government's genuine view of that damage and Rezko's value, the government ultimately decided in the Cellini trial that it would call Levine, not Rezko, to the witness stand. This was a considered decision, but one which reflects the government's best judgment about the relative credibility of Levine and Rezko, albeit in the context of that specific case.

Again, to be clear, the government agrees that Rezko's cooperation warrants a reduction in his sentence. But the value of Rezko's assistance must be measured against the assistance provided by others, particularly Levine, when assessing what kind of discount Rezko should receive. Here, in light of Rezko's history and self-imposed damage to his credibility, the government views the value of his cooperation as modest. The government's proposed sentence of 11-15 years includes a discount from Rezko's 2003 Guidelines range to reward Rezko for his cooperation. He deserves no more on that score.

**E.    Rezko's Conditions of Confinement Do Not Justify a Sentence of Time Served**

Much of Rezko's appeal for a sentence of time served is based on his portrayal of his conditions of confinement. The government agrees that this is one of the very rare instances in which it would be appropriate under Section 3553 to reduce Rezko's ultimate

sentence because of those conditions, albeit to a significantly lesser extent than what Rezko suggests.

Rezko frames his argument about his conditions of confinement in part by comparing his situation to that of other defendants in this case. That is a false comparison. No other defendant committed perjury in sworn testimony relating to his bond, engaged in hidden international financial transactions worth millions of dollars, or otherwise violated the trust of the judge supervising their release such that it was necessary to revoke their bond. The fact that Rezko's bond was revoked was his own fault – a critical distinction that Rezko does not address.

Nonetheless, the government agrees that the Court should consider the approximately 9 months that Rezko spent in solitary confinement at the MCC as a reason to reduce Rezko's sentence under Section 3553.[18] The government does not view Rezko's time at Dodge County as being worthy of the same consideration. There are many defendants who serve sentences at county facilities pending the completion of their cooperation with the government. The fact that Rezko is a white-collar defendant, which makes his situation less common, does not warrant a departure. There are not two classes of jails: ones acceptable to white-collar defendants and another class for everyone else.

_____

[18] To be clear, the government would not normally agree that a defendant placed in solitary confinement would be deserving of a reduction in his or her sentence. Rezko's situation is unique in that he was placed in solitary for his own protection in the context of an extraordinarily high profile investigation involving the Governor of Illinois, and not because of any misdeed in custody on his part or because of the nature of the crime he committed (e.g., because he was a corrupt police officer or had committed a sexual crime against a minor).

46

Ultimately, the government's recommendation of a 11-15 year sentence for Rezko includes a downward adjustment in recognition of Rezko's time in solitary confinement at the MCC.

### F.      Rezko's Letters of Support Do Not Justify a Sentence of Time Served

Rezko has enjoyed many privileges and good fortune in his life.  He made millions in various businesses, was a leader in his community, and enjoyed a large and supportive family.  In short, Rezko has had a wealth of advantages which distinguish him from the typical defendant, who has few if any of those supports or advantages.

Rezko now has demonstrated that he continues to have many supporters, including family and friends, through the many letters that he has provided to this Court.  Those letters describe many acts of generosity or charity that Rezko argues weigh in favor of a sentence of time served. The Court should consider those letters, and the acts they describe, as mitigating factors.  But in considering those letters, the Court should keep in mind that Rezko's powerful position in business and politics gave him the ability to bestow favors on those he chose to help.  As the Seventh Circuit has stated:

> Wealthy people commonly make gifts to charity.  They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card....
> [C]haritable works must be exceptional before they will support a more-lenient sentence, for . . . it is usual and ordinary, in the prosecution of similar white collar crimes involving high-ranking corporate executives. . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts.  People who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot.

*United States v. Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) (internal citations

omitted).

The Court will not receive a letter from all the people who were cheated or defrauded by Rezko's activities. Indeed, this is not possible, as his victims included all the citizens of Illinois. Rezko's acts of generosity to his friends and family cannot balance out the harm that he has done in his life in the course of his illegal behavior. He should be punished accordingly.

## V.     CONCLUSION

For the reasons stated above, the government respectfully asks that the Court sentence defendant Antoin Rezko to a term of imprisonment of between 11 and 15 years.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:     s/Christopher S. Niewoehner
CHRISTOPHER S. NIEWOEHNER
REID J. SCHAR
CARRIE E. HAMILTON
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300